**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ken ALIKPO, Defendant–Appellant.**

**No. 90–2234.**

United States Court of Appeals,
Fifth Circuit.

Sept. 23, 1991.

Sunny Leigh Kapungu, Houston, Tex., for defendant-appellant.

James L. Turner, Paula Offenhauser, Asst. U.S. Attys., Ronald G. Woods, U.S. Atty., Houston, Tex., for plaintiff-appellee.

* Chief District Judge, Western District of Texas, sitting by designation.

1. The record reflects varied spellings of defendant's surname, including "Alipko" and "Aliko."

Before POLITZ and HIGGINBOTHAM, Circuit Judges, and BUNTON, District Judge.*

POLITZ, Circuit Judge:

Ken Alikpo[1] appeals his conviction on four counts of conspiracy related to the importation, possession, and intended distribution of heroin. Finding that the trial court erred by conducting most of the jury selection process in the absence of the defendant, without his express waiver of the statutory and constitutional right to be present or other reason justifying same, we vacate and remand.

*Background*

Alikpo, a Nigerian citizen and permanent resident alien of the United States, was arrested after substantial evidence implicated him in a scheme involving a second Nigerian man, Festus Syder. Upon his arrival at Kennedy International Airport from a Lagos flight, Syder was met by United States Customs Service agents and consented to an x-ray examination which revealed 60 balloons within his gastrointestinal tract. Syder was taken to a local hospital and there passed the balloons which were found to contain 370 grams of 95% pure heroin.

Syder agreed to assist law enforcement officials in apprehending his coconspirators in the drug-running scheme. He made several telephone calls to Alikpo's Houston residence and arranged a meeting at Houston Intercontinental Airport. Alikpo, Syder, and a third accomplice, Lavinius Ezikeuzo, were arrested at the airport.

Alikpo was indicted on four felony conspiracy counts. Trial was set for March 10, 1989. On that day, voir dire began with the court's remarks to the members of the venire. The court was interrupted by the prosecutor:

We use herein the spelling found on the docket sheet and in the brief of his counsel.

MR. DAVIDSON [AUSA]: Judge, I apologize for interrupting you. May we approach the bench?

THE COURT: Yes, sir.

(At the bench)

THE COURT: We were discussing the fact that Mr. Alikpo is not yet here. And Mr. Todaro [defense counsel] says that he is willing to go ahead if he can, but not finish without him here. Mr. Davidson has no problem with that.

MR. DAVIDSON: As I mentioned, Judge, my only concern is making sure the record stayed clean. As long as there is not a problem with him waiving it.

MR. TODARO: As far as recognizing or do it by name. And he will be here before we finish. If we want to clear up that final point, okay.

MR. DAVIDSON: That is fine.

THE COURT: I am sorry. I assumed that you all discussed it and you were willing to go ahead.

MR. DAVIDSON: He told me, Judge. I was not sure whether in criminal cases you could waive the defendant's presence in trial.

THE COURT: We have had a lot of cases—

MR. DAVIDSON: I am sorry. Where they voluntarily absented themselves.

THE COURT: Okay.

The district judge then continued his prefatory instructions to the jury venire and asked questions designed to elicit any indications of prejudice against suspects in drug trials, African immigrants, and the criminal justice system. The court then permitted the AUSA to question the jury.

MR. DAVIDSON: Thank you, Judge. Good afternoon ladies and gentlemen. My name is Charley Davidson. I am an Assistant United States Attorney, and I am going to be the person that is going to be prosecuting the case that those 12 or 13 of you who are selected as jurors are going to be hearing this week.

Also seated with me during this trial is going to be Tony Singleton who is an agent with the US Customs Service. Let me ask you all initially, does anybody here feel like they recognize me or Agent Singleton, or may have seen me before in a professional capacity or out on the street somewhere?

Likewise, does anybody here know Michael Todaro who is the attorney representing Ken Alikpo? Anybody know either one of these individuals or think you've ever seen them before somewhere?

The AUSA then questioned several prospective jurors about their ability to deal with concepts such as evidentiary conflicts and conspiracy law. At a point not disclosed in the record Alikpo entered the courtroom. The first indication of his presence in the courtroom is in his counsel's comments to the venire.

MR. TODARO: Thank you, Your Honor.

I am Michael Todaro. As you probably imagined by now, I am the attorney for the defense. This is my client here, Ken Alipko.

Following a few more remarks the jury was selected and evidence was presented, including the testimony of Alikpo. After deliberating, the jury returned guilty verdicts for: (1) conspiracy to aid and abet the importation of in excess of 100 kilograms of heroin; (2) conspiracy to possess in excess of 100 kilograms of heroin; (3) aiding and abetting in the importation of in excess of 100 kilograms of heroin; and (4) aiding and abetting in the possession of in excess of 100 kilograms of heroin. 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, 952(a), 960(b)(2). Alikpo was sentenced to 120 months imprisonment on each count, to be served concurrently, and 60 months supervised release on each count. The trial court recommended deportation. Alikpo timely appealed.

*Analysis*

██ Alikpo first contends that the trial court erred by commencing trial in his absence. We agree. Presence at trial is a fundamental right. While this right is waivable the record before us is, as the government concedes, "insufficient to support a finding of waiver." The right may

also be forfeited under certain circumstances, none of which exist herein.

Federal Rule of Criminal Procedure 43 sets out the specifics for a defendant's right to be present.[2] It incorporates "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause [which] is the accused's right to be present in the courtroom at every stage of his trial," *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)), and is recognized as broader than the confrontation protection of the sixth amendment. 3A C. Wright, *Federal Practice and Procedure* § 721 (2d ed. 1982 & 1991 Supp.) ("Rule 43 has been understood to codify both a defendant's constitutional right and his common law right to be present throughout a trial; its scope is therefore broader than the constitutional right alone.") (footnote omitted); *cf. United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). The right to be in attendance during jury selection has been specified in Rule 43 since its adoption in 1944. It was then considered a restatement of existing law. Fed. R.Crim.P. 43(a), Notes of Adv. Comm. on Rules ¶ 1 (1944).

Rule 43 makes clear that a defendant has an absolute right to be present at the beginning of the trial. While such activities as flight or in-court misbehavior may excuse absence once the trial has commenced, *see* Rule 43(b), convening a criminal tribunal without the presence of the defendant treads precariously close to the concept of trial *in absentia* which our system has long disdained. *United States v. Benavides*, 596 F.2d 137 (5th Cir.1979); *see also* Annotation, *Validity of Jury Selection as Affected by Accused's Absence from Con-*

ducting of Procedures and Impaneling of Final Jury Panel for Specific Case, 33 A.L.R. 4th 429 (1984). Set against this backdrop the AUSA understandably expressed concern regarding Alikpo's absence when the venire was seated.

While the right is, as noted, waivable, the ambiguous statement by the court, "Mr. Todaro says that he is willing to go ahead if he can, but not finish without him here," and the defense counsel's more ambiguous response, both made out of Alikpo's presence, do not suffice to constitute a valid waiver. The long-standing presumption against waiver of fundamental rights embodied in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and the plain language of Rule 43, both militate against the commencement and continuation of the trial in light of the defendant's absence.

■ Conceding that there was no waiver the government suggests that the error was harmless. We have recognized such harmless error, pursuant to the teachings of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), but only if we find beyond a reasonable doubt that the defendant's absence did not prejudice his substantial rights. *United States v. Gradsky*, 434 F.2d 880 (5th Cir.1970), *cert. denied sub nom., Roberts v. United States*, 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971) & 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972). In *Gradsky*, we rejected the appellants' contention that their absence from an evidentiary hearing, at which their attorney indicated their presence was not necessary and at which counsel was afforded ample opportunity for cross-examination, constituted reversible

---

**2.** Rule 43 provides in pertinent part:

(a) Presence required. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

(b) Continued Presence Not Required. The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to

have waived his right to be present whenever a defendant, initially present,

(1) is voluntarily absent after the trial has commenced (whether or not the defendant has been informed by the court of the obligation to remain during the trial), or

(2) after being warned by the court that disruptive conduct will cause the removal of the defendant from the courtroom, persists in conduct which is such as to justify exclusion from the courtroom.

error.[3] In dicta, we noted:

> Furthermore, it is well established that Rule 43 must be considered with Rule 52(a), Fed.Rules Cr.Proc., which provides that harmless error is to be disregarded.... We ... reject appellants' contentions that their constitutional rights have been violated, and we find beyond a reasonable doubt that any possible error in their absence from the hearings did not affect their substantial rights.

*Id.* at 884 (citations omitted). The case at bar markedly differs from the proceeding discussed in *Gradsky.* Jury selection is a stage of trial which is specifically enumerated in Rule 43. Equally if not more importantly, it is a stage at which the defendant can provide meaningful assistance to counsel, as distinguished from a proceeding involving solely points of law.

We inquired into the degree of error inherent in the defendant's absence from voir dire in *Henderson v. United States,* 419 F.2d 1277 (5th Cir.1970), a section 2255 habeas case. During Henderson's absence

> five things happened: the government announced it had no challenges for cause. Petitioner's attorney challenged one juror for cause, which challenge was granted. Another juror was substituted and the United States announced it was satisfied. Petitioner's attorney announced he was satisfied with the juror. The United States announced that it had no peremptory challenges with respect to the remaining 12 jurors. At this stage on discovery that defendant was not present, he was brought into the Judge's chambers and Court asked his counsel whether there "was any need * * * to go back through the preliminaries with respect to the exercise of challenges for cause." To this his counsel answered with a categorical "No." The momentary error of inadvertently allowing Petitioner to be absent brought no harm to

> him since nothing occurred to his detriment, the Trial Court offered an opportunity to go back through the entire procedure, which was declined, and Petitioner was present during the entire peremptory challenge period and only 6 of his 10 peremptory challenges were exercised.

*Id.* at 1278. We perceive the instant case as presenting facts materially different from the errors determined harmless in *Henderson.* The government argues that Alikpo's presence at the exercise of the jury strikes ameliorated the prejudicial effect of his absence. While we agree that presence during the exercise of peremptory challenges is a critical stage of the voir dire process, the defendant is sorely handicapped and can be of little assistance to counsel when he has not had the opportunity to hear the venire's responses to questions and observe their reactions to him and to the proceedings.

Moreover, we cannot agree with the government's suggestion that Alikpo suffered no prejudice from absence at the beginning of the proceedings. It does not stretch the limits of credulity to envision a juror being adversely affected, consciously or unconsciously, by an accused heroin smuggler cavalierly walking in late for his trial. Our colleagues in the D.C. Circuit arrived at a similar conclusion in a recent holding concerning a defendant who missed *all* of voir dire. *United States v. Gordon,* 829 F.2d 119 (D.C.Cir.1987). Distinguishing cases in which defendants, although present for questioning of the venire, had merely not participated in exercise of peremptory challenges, the court wrote:

> Additionally, there is the question of what went on in the jurors' minds as they spent the first several hours of the trial wondering where the defendant was. The fact that a defendant, sitting at counsel table, does not go to the bench during a small portion of the voir dire quite likely escapes the notice of the

---

**3.** Since the *Gradsky* case, Rule 43(c) has been amended to permit the defendant's absence, without waiver, "[a]t a conference or argument upon a question of law." The hearing considered in *Gradsky* concerned the issue of whether illegally-obtained electronic surveillance of a codefendant's telephone conversa-

tions had tainted the convictions of the remaining codefendants. Whether such a hearing would constitute "an argument upon a question of law" is not a question now before us. *See generally United States v. De Los Santos,* 819 F.2d 94 (5th Cir.1987).

jury. A defendant, however, who does not make his appearance until midway through the first day of his trial is surely noticed by the jury, and it is not beyond a reasonable doubt that "the jury speculated adversely to the defendant about his absence from the courtroom." To hold Gordon's absence harmless under these circumstances therefore would be to "reconstruct what might have eventuated had he been present, when that cannot truly be reconstructed with a degree of certainty necessary to avoid the reasonable possibility of prejudice."

*Id.* at 128–29 (quoting *Wade v. United States,* 441 F.2d 1046, 1050 (D.C.Cir.1971)).

Further, we have the anomalous situation of the prosecutor inadvertently underscoring the defendant's absence by asking the venire if anyone knew or recognized the prosecutor, the case agent, or defense counsel. What about the defendant? [4] The burden of proving harmless error is an onerous one. *Chapman; Gradsky.* The government has not borne that burden herein.[5]

The convictions are VACATED and the matter is REMANDED for a new trial.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry Jerome STOKES, Murrell Adams,**
**and John Willie Anderson,**
**Defendants–Appellants.**

**No. 90–1905.**

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1991.

---

**4.** At no time was the venire asked whether or not they knew or recognized Alikpo, except for defense counsel's invitation for the venire to feel free to bring up information they might feel relevant on their ability to deal fairly and impartially with his client.

**5.** As a consequence of today's disposition we need not address the appellant's complaint about remarks made by the prosecutor during closing argument.

Thomas L. Kesler, Columbus, Miss. (Court-appointed), for Stokes.

Jim Waide, Tupelo, Miss. (Court-appointed), for Adams.

Charles D. Easley, Jr. (Court-appointed), and James A. Walters, Jr. (for presentation of oral argument only), Columbus, Miss., for Anderson.

Charles W. Spillers, Asst. U.S. Atty. and Robert Q. Whitwell, U.S. Atty., Oxford, Miss., for the U.S.

Before REAVLEY, POLITZ and DUHÉ, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants Larry Jerome Stokes, Murrell M. Adams and John Willie Anderson were convicted of using and conspiring to use threats of violence to collect an extension of credit in violation of 18 U.S.C. section 894. They appeal their convictions, challenging the applicability of section 894 to the facts of this case, and the sufficiency of evidence to prove an extension of credit. These appellants were wrongdoers, but they were prosecuted in the wrong court. They were guilty of no federal offense; we reverse the convictions.

## I. BACKGROUND

Defendant Larry Stokes did construction work for a living. Ronnie Richardson owned a wrecker business and developed real estate. In August 1988, Richardson asked Stokes to build a road base, and the two men entered into a written contract under which Stokes was to be paid as the contract was fulfilled. Richardson became impatient with Stokes' progress. Early in November 1988, after some negotiation, Richardson cancelled the contract with Stokes.

Stokes promptly sent Richardson a bill for $4,158.11 for the work performed. Richardson did not pay. Stokes himself approached Richardson about six months later demanding payment. Richardson stalled.

In July 1989, Stokes hired a lawyer, Douglas Dalrymple, to try to collect from Richardson. Dalrymple sent Richardson a letter in July 1989 attempting to collect Stokes' claim. Dalrymple also discussed with Stokes the possibility of obtaining a lien against Richardson's property. But Stokes did not file a lawsuit against Richardson.

Instead, Stokes devised an alternate plan to make Richardson pay. On the morning of December 19, 1989, Stokes called four of his employees, Murrell Adams, Kevin Johnson, John Anderson and Adam Gurley, into his office and told them about his plan.

Richardson owned a heavy-duty wrecker truck, and Stokes wanted to take possession of it and assert a lien against it. Stokes' plan was for Anderson to call Richardson at Richardson's business, Richardson Towing and Recovery. Anderson would tell Richardson that Anderson had a truck in need of towing. Johnson would then drive Anderson to meet Richardson at a convenience store. Anderson and Richardson, in Richardson's truck, would follow Johnson ostensibly to the location of Anderson's disabled truck. In fact, Johnson was to lead Richardson back to the yard of Stokes Excavation Company. Once Richardson was in the yard, Adams and Gurley were to block Richardson's wrecker in the yard with two of Stokes' dump trucks.

Stokes' plan, as formulated and told to these employees on December 19, had a further aim. Stokes also wanted to "shake up" Richardson to make him pay. During the planning meeting, Stokes gave

Anderson his knife. He told Anderson to use the knife to scare Richardson if necessary. Johnson and Gurley had shotguns because they had been hunting on the morning of December 19, and Stokes told Johnson and Gurley that they could use the shotguns to scare Richardson. He told them that it was all right to fire the shotguns in the air, even indoors through the roof of the office, to scare Richardson.

Around 1:00 p.m. on December 19, Richardson met Anderson and Johnson as planned, and the group proceeded to the yard of the Stokes Company. Richardson became suspicious when he saw the Stokes Company name on some of the equipment in the yard. He told Anderson that he thought something was not right, and he was being set up. Anderson then engaged and locked the air brakes on Richardson's wrecker. Richardson reached for his two-way radio, and Anderson grabbed his arm. A struggle ensued, during which Anderson displayed the knife that Stokes gave him. Meanwhile, Adams and Gurley positioned their trucks.

Anderson ordered Richardson out of the wrecker, and Richardson complied. Anderson and Richardson went into Stokes' office, followed by Johnson, Gurley and Adams. Stokes demanded five thousand dollars from Richardson "right then." When Richardson refused, Stokes threatened to "whip" Richardson. Stokes produced a handwritten document prepared some time in advance of the meeting. The document states, "I, Ronnie Richardson, agree to leave my wrecker in the possision [sic] of Larry Stokes until my bill of $5,000 is paid in full." Stokes told or asked Richardson to sign the document. Richardson refused. Anderson commented that the men should take Richardson out back and do something to make him "come around." Gurley audibly worked the action of a pump shotgun.

Richardson signed the document. Anderson, Johnson and Gurley signed as witnesses. Adams had left the room, and was absent when the signing took place. Stokes then warned Richardson that he had a buyer for the truck that day. He told

Richardson to get the $5,000. Richardson testified that Stokes said Richardson "wouldn't see the light of day" until he got the money.

Stokes suggested Richardson could have his wife or father bring the money. Richardson said that was impossible. Richardson testified someone threatened again to take him outside and make him cooperate, but could not recall who made this threat. Either Stokes or Richardson suggested Richardson could borrow the money from the bank. Stokes allowed Richardson to call one Robert Lamar, a representative of Richardson's bank, to obtain a loan. Lamar told Richardson to come to the bank.

Under Stokes' orders, Johnson drove Richardson to the bank with Adams riding along. Anderson and Gurley followed in another truck. Anderson still had Stokes' knife. Anderson and Gurley also carried a shotgun. On the way to the bank, Adams advised Richardson that Stokes was "crazy" and would hurt or kill Richardson if he did not cooperate.

Upon arrival, Adams and Richardson went inside the bank while Johnson waited outside. As soon as Richardson was able to speak with Lamar, he told Lamar that he was being kidnapped and needed the police. The police arrived and arrested Adams in the bank. They arrested Johnson, Gurley and Anderson outside, and seized the shotgun and knife. The police went to Stokes Excavation Company where they found and arrested Stokes, who surrendered the document that Richardson had signed.

The government charged Stokes, Adams, Anderson, Gurley and Johnson in count one with using and conspiring to use extortionate means to collect an extension of credit, in violation of 18 U.S.C. section 894; in count two with conspiracy to violate 18 U.S.C. section 894; in count three with conspiracy to use extortion to affect interstate commerce in violation of 18 U.S.C. section 1951; in count four with violation of 18 U.S.C. section 1951; and in counts five and six with carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. section 924(c)(1). The government voluntarily dis-

missed counts three, four and six before trial. The government deferred prosecution of all charges against Johnson and Gurley under a pretrial diversion agreement, subject to their testifying at trial against Stokes, Adams and Anderson.

The case was tried to a jury before the Honorable L.T. Senter, Jr., commencing on April 23, 1990. Following a four-day trial, the jury found Stokes, Adams and Anderson guilty of counts one and two, and not guilty of count five. The district court sentenced the defendants to terms of imprisonment totalling sixty months for Stokes, twelve months for Adams, and twenty-four months for Anderson. All of these terms required downward departure from the federal sentencing guidelines.

## II. DISCUSSION

Congress has made it a crime to participate knowingly, or conspire to participate "in any way ... in the use of any extortionate means ... to collect or attempt to collect any extension of credit." 18 U.S.C. section 894(a)(1). And,

[t]o extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

*Id.*, section 891(1).

■ Appellants contend that section 894 does not apply to ordinary commercial transactions. We disagree. Congress meant section 894 to apply primarily to loansharking by organized crime, but did not draft the statute to proscribe only loansharking. The statute does not require proof of loansharking, organized crime, or an underlying criminal transaction. Section 894 applies to extortionate credit transactions as a class of activities. *United States v. Roberts*, 546 F.2d 596, 598 (5th Cir.), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977).

This court has applied section 894 in a commercial context with no nexus between the extension of credit and either organized crime or other underlying illegal activity. *United States v. Natale*, 764 F.2d 1042, 1044–46 (5th Cir.1985). In doing so, we noted that "extension of credit," as defined in section 891(1), could be simplified to read, "to enter into *any* agreement whereby the satisfaction of *any* claim will be deferred." *Id.*, 764 F.2d at 1045 (emphasis in original).

Appellants contend there was no evidence of an extension of credit within the meaning of section 894, and therefore no fact issue existed for the jury. Under the definition of extension of credit that is required by section 891(1), we agree there was no evidence of an extension of credit.

■ Section 891(1) defines an extension of credit as either a loan, or an agreement to defer payment of a debt or claim. There being no contention that Stokes made a loan to Richardson, the government had to prove an agreement to defer payment of a debt or claim.[1] The debt or claim could be invalid or unacknowledged, and the agreement could be tacit or express.

---

1. The courts are not agreed on the showing necessary to prove an agreement to defer payment. *United States v. DiPasquale*, 740 F.2d 1282, 1287 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985), on which the trial court relied, found sufficient under section 894 an indictment that charged the defendant with using extortion "to collect and attempt to collect a claimed debt ...," without reference to any extension of credit or agreement to defer. *Id.* at 1287.

Contrary to the holding in *DiPasquale*, many courts require proof of an assent to deferral by the creditor. These courts typically find that such assent may be proved by minimal conduct. *See United States v. Traitz*, 871 F.2d 368, 388 (3d Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989) (despite *DiPasquale*, agree-

ment to defer was a necessary element, but could be inferred from a policy allowing union members to defer payment of a fee until the end of the month); *United States v. Lopez*, 803 F.2d 969, 974–75 (9th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987) (agreement to accept bad checks until funds were deposited); *United States v. Brinkman*, 739 F.2d 977, 983 & n. 5 (4th Cir.1984) (express agreement to defer recovery of royalty payments pending financial recovery of payor); *United States v. McMahan*, 744 F.2d 647, 650 (8th Cir.1984) (agreement to accept check with subsequent extortion to collect when check bounced); *United States v. Czarnecki*, 552 F.2d 698, 703 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977) (agreement to pay off bet at conclusion of horse race); *United*

---

States v. Boulahanis, 677 F.2d 586, 590–91 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982) (implying a minimal showing would be sufficient).