# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-70002

United States Court of Appeals
Fifth Circuit

**FILED**

October 24, 2019

Lyle W. Cayce
Clerk

JOE MICHAEL LUNA,

>   Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

>   Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:15-CV-451

Before DENNIS, GRAVES, and COSTA, Circuit Judges.

PER CURIAM:*

A jury convicted Joe Michael Luna of capital murder and sentenced him to death. Following denials of his direct appeal and habeas petition in the state courts, he raised fifteen claims in a federal habeas petition. The district court denied them all and denied a certificate of appealability (COA). Luna now

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-70002

requests from this court a COA on four of his federal claims.  We grant one and deny three.

## I.

Luna used a crawl space connected to his girlfriend's apartment to sneak into Michael Andrade's apartment in the middle of the night.  Intending a burglary, he thought Andrade's apartment would be empty.  It was not.  Luna found Andrade sitting up in bed, held him at gunpoint, and tied him up.  After collecting items from around the apartment, Luna began to worry that Andrade would speak to the police, connect the intruder to the crawl space, and thus connect Luna to the crime.  So Luna strangled Andrade to death. Andrade was in his fourth year as a premed student at St. Mary's in San Antonio.

At the beginning of his trial, Luna pleaded guilty in front of the jury. The court then held a one-phase trial that included evidence relevant to both guilt and punishment, followed by an instruction that the jury find Luna guilty and answer the special issues relevant to the death penalty: whether Luna would be a danger in the future, and, if so, whether mitigating circumstances warranted a sentence of life in prison rather than death.  *See* TEX. CODE CRIM. PROC. art. 37.071.

Among other things, the state's evidence included testimony about Luna's substantial criminal history, which included car thefts—one of which involved Luna's trying to run a police officer over with the car; a carjacking that ended with Luna and his companions leaving the victim bound with duct tape in the woods; and multiple home invasions during which Luna tied up families at gunpoint while he robbed them.  There was also evidence that Luna had been plotting an escape at some point between his arrest and trial.

When the prosecution rested, and against his counsel's advice, Luna testified on his own behalf.  He said that he had pleaded guilty because he had

decided to get right with God. He also expressed remorse for his crimes, particularly the murder. Luna then testified that he wanted the death penalty. He said that a prior stint in prison had not rehabilitated him, and he expected that a lifetime in prison would only "make me worse than I am now."

The defense called two other witnesses. The first was Margaret Drake, a clinical social worker and mitigation specialist, who had prepared a "psychosocial assessment" after talking to Luna and his relatives. Her testimony included potentially mitigating evidence, including that Luna's mother moved around a lot, requiring him to frequently change schools; that his father was largely absent from his young life; that a "number" of Luna's relatives were "involved" in substance abuse, and an "unusual number" of them had criminal histories; that some members of Luna's family suffered from "mental difference[s]" ranging from depression or schizophrenia to Down's Syndrome or seizure disorders; and that Luna has at least one son, as well as a "very good relationship" with his former girlfriend's son. Drake also testified that one of Luna's mother's boyfriends was "quite violent" and that they were "often very much afraid of him."

Dr. Brian Skop, a forensic psychiatrist, also testified. He had interviewed Luna and conducted an intelligence screening test that showed an IQ of 89, "in the low average range." The remainder of Skop's testimony on direct examination had to do with future dangerousness. On cross examination, the prosecutor asked why Skop "didn't do the normal thing that you do where you make diagnoses about—for the different axes."[1] Skop explained that he had been asked to analyze only Luna's future dangerousness.

---

[1] This presumably referred to the then-prevailing categorization of mental disorders along particular "axes." *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000).

No. 19-70002

The defense then rested.  The jury answered the special issues in favor of the death penalty.

## II.

We may authorize an appeal from the denial of a habeas petition "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  That means reasonable jurists "could disagree" with the district court's analysis or could conclude the issues otherwise "deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In a capital case, any doubt is resolved in favor of granting a COA.  *Hughes v. Dretke*, 412 F.3d 582, 588 (5th Cir. 2005).

For any claim adjudicated on the merits in state court, the COA "debatability" standard is considered through the lens of deference given by the Antiterrorism and Effective Death Penalty Act of 1996.  *Prystash v. Davis*, 854 F.3d 830, 835 (5th Cir. 2017).  AEDPA allows a federal court to grant habeas relief only if the state court's conclusions of law were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  AEDPA requires deference to the state court's findings of fact, too, unless they were unreasonable.  *Id.* § 2254(d)(2).

## A.

Luna's first claim is that his trial counsel was constitutionally ineffective for failing to investigate and present additional mitigating evidence.  He contends (1) that his mother knew of and was willing to testify about sexual and physical abuse he suffered as a child; and (2) that a thorough examination of his psychological state would have revealed that he suffers from a variety of mental health problems, including schizophrenia, depression, and PTSD.

To prevail on this claim, Luna will ultimately have to show not only that his counsel's investigation into his background and mental health was

4

No. 19-70002

objectively unreasonable, but also a reasonable probability that at least one juror would have voted against the death penalty if aware of the mitigating evidence a reasonable investigation would have turned up. *See Wiggins v. Smith*, 539 U.S. 510, 520–21, 537 (2003). Counsel is presumed to have rendered adequate assistance. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). That presumption, plus AEDPA deference, means federal courts are "doubly deferential" when reviewing whether counsel's assistance was constitutionally deficient. *Cullen v. Pinholster*, 563 U.S. 170, 189–90 (2011). Despite the demanding standard of review, and keeping in mind that any doubts at the COA stage in a capital case should be resolved in favor of allowing the appeal, we conclude that reasonable jurists could debate the outcome of this claim. Accordingly, we grant a COA on the ineffective assistance claim.

B.

Luna's second claim raises his due process right to be present at critical proceedings. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). He argues that he should have been in the courtroom when the trial judge excused prospective jurors before voir dire.[2]

At the threshold, the Director argues that Luna procedurally defaulted this claim by failing to raise it on direct appeal, as Texas law requires for claims like this one. *See Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) (en banc). The state habeas court,[3] in addition to making a merits finding, denied this claim under that adequate and independent state procedural rule. *See Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005). Ordinarily, that would

---

[2] Luna casts this claim both in terms of due process and in terms of his Sixth Amendment confrontation right. But there is no confrontation right when there are no witnesses to confront. *United States v. Thomas*, 724 F.3d 632, 642 (5th Cir. 2013).

[3] Unless otherwise noted, the Texas Court of Criminal Appeals adopted, in an unreasoned opinion, the findings and conclusions of the state district court (which we call the "state habeas court"). *Ex parte Luna*, 2015 WL 1870305 (Tex. Crim. App. Apr. 22, 2015).

preclude federal habeas relief. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). Luna, however, argues that his direct appellate counsel was constitutionally ineffective by failing to raise this claim. Procedural defaults can be excused, and one way to excuse a default is to show it resulted from ineffective assistance. *Id.* at 2064–65.[4] Whether Luna's appellate counsel was deficient is largely bound up with the merits of the underlying claim, so we look to the merits. *See Amador v. Quarterman*, 458 F.3d 397, 410–11 (5th Cir. 2006) (explaining that appellate counsel need only bring "[s]olid, meritorious arguments").

It is not altogether clear what happened as there is no transcript of the pre-voir dire assembly. But it appears that a fraction of the venire panel was "excused" at that time. Typically at a "general assembly" venire members are "qualified on their ability to serve and exemptions and excuses are heard," before they are "sent to the individual courts trying the cases." *See Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001). The general assembly is not part of the trial and there is no constitutional right to be present. *Moore v. State*, 999 S.W.2d 385, 399 (Tex. Crim. App. 1999).

But Luna says the process in his cases was not the typical general assembly because the excused potential jurors had already been assigned to his case. *See Jasper*, 61 S.W.3d at 423 ("assum[ing]" that the right to be present had attached when "the trial judge assigned to preside over appellant's trial appears to have functioned as a general assembly judge over prospective jurors *already assigned to [the] appellant's specific case*" (emphasis in original)). The federal district court rejected that argument.[5]

---

[4] Contrary to the Director's position, Luna preserved this excuse by arguing it on state habeas. *See Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009).

[5] We do not discuss the state habeas court's merits finding on this claim because the Texas Court of Criminal Appeals vacated it. *Luna*, 2015 WL 1870305.

No. 19-70002

We need not delve into whether the excused jurors had been technically assigned to Luna's case. The due process question is whether Luna's presence at the proceeding would have been helpful to his defense. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) ("[The] presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107–08 (1934)). And that inquiry turns on the reasons the prospective jurors were dismissed. Defendants have the right to be present at voir dire, for instance, because they can help decide what questions to ask prospective jurors or how to exercise peremptory challenges. *United States v. Curtis*, 635 F.3d 704, 715 (5th Cir. 2011); *United States v. Gordon*, 829 F.2d 119, 124 (D.C. Cir. 1987).

What evidence there is indicates that the prospective jurors dismissed before voir dire were dismissed for reasons having nothing to do with Luna's case. The trial judge's first remark, once the remaining prospective jurors were gathered with Luna and counsel, was that one prospective juror had "been working for like two days straight" but "really didn't want to be excused." The judge then announced the case, introduced the parties, and described in detail how capital trials work in Texas, as well as the questionnaires the jurors would be asked to fill out. If the judge had already excused jurors for case-specific reasons, he would already have provided them that information. By all appearances, the jurors were excused for hardships and possibly statutory exemptions or disqualifications. *See* TEX. CODE CRIM. PROC. art. 35.03.

Unlike the role defendants and their counsel have in exercising peremptory strikes during voir dire, judges determine whether jurors are excused for hardships or exemptions (sometimes these exemptions are granted before venire members show up for jury duty). *Id.* So the defendant's presence, or lack thereof, when the judge considers jurors' requests to be excused would

7

No. 19-70002

seem to make no difference. *Cf. Gagnon*, 470 U.S. at 527 (holding that defendants had no right to be present during judge's in-chambers questioning of a juror during which defendants "could have done nothing had they been" present).[6]

So we doubt that Luna has a due process claim because he was absent from the pre-voir dire proceeding. But we need not decide whether that question meets the COA threshold because it is beyond debate that any error was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (explaining that on federal habeas review, nonstructural errors in a state trial are harmless unless they "had substantial and injurious effect or influence in determining the jury's verdict"). There is no indication that an excused potential juror was more favorable to Luna than those who ultimately sat. Neither is there any indication that a juror was excused improperly. *See Jasper*, 61 S.W.3d at 424 (describing trial court's "broad discretion to excuse prospective jurors for good reason"). And even if there were reason to think that a favorable potential juror was excused improperly, Luna's presence would not have put that person on the jury. As we have already explained, unlike with voir dire, the defendant has no role to play in excusing prospective jurors for hardships, exemptions, or disqualifications.

---

[6] To be clear, the defendant's presence may be helpful, and the defendant may thus have a right to be present, during some pre-voir dire hearings on juror dismissals. But that is only when the potential dismissals are for reasons particular to the defendant, as when prospective jurors are excused because they are "friends or supporters" of the defendant. *See United States v. Bordallo*, 857 F.2d 519, 522–23 (9th Cir. 1988). During those types of proceedings, the defendant can offer insight into the facts potentially warranting dismissal. Not so during proceedings on requests to be excused, which are granted or denied without regard to the case a prospective juror is assigned to. *United States v. Greer*, 285 F.3d 158, 167–68 (2d Cir. 2002); *see also Cohen v. Senkowski*, 290 F.3d 485, 489–90 (2d Cir. 2002) (distinguishing examination of prospective jurors about exposure to the defendant's case, during which the defendant has a right to be present, from examination of prospective jurors about excusals for hardships).

No. 19-70002

Perhaps recognizing that he cannot show the decision to excuse jurors impacted the outcome of his case, Luna's only response is that the error was structural and thus not subject to the harmless error rule. But there is a wealth of precedent going the other way. *See Rushen v. Spain*, 464 U.S. 114, 117–18, 121 (1983) (holding that defendant's absence during judge's communication with juror was harmless). This court and others have held that absence during voir dire can be harmless. *United States v. Alikpo*, 944 F.2d 206, 209–10 (5th Cir. 1991) (conducting harmless error analysis but holding that defendant's absence was not harmless); *see also United States v. Rivera-Rodriguez*, 617 F.3d 581, 604 (1st Cir. 2010); *United States v. Riddle*, 249 F.3d 529, 535 (6th Cir. 2001). If absence from voir dire can be harmless, then absence from pre-voir dire excusals certainly can. Indeed, the two cases on which Luna most relies for this claim held that the defendant's absence when jurors were dismissed was harmless beyond a reasonable doubt. *Bordallo*, 857 F.2d at 523; *Jasper*, 61 S.W.3d at 423–24.

Any possible error, which again we doubt existed in the first place, was harmless. We thus deny a COA on this claim.

C.

Luna's third claim argues that the trial court erroneously concluded that a juror's views on the death penalty warranted striking the juror for cause. *See Witherspoon v. Illinois*, 391 U.S. 510, 521–22 (1968). As with his previous claim, Texas law required Luna to bring this one on direct appeal. *See Nelson*, 137 S.W.3d at 667; *Aguilar*, 428 F.3d at 535. In addition to denying this claim on the merits, both the state habeas court and the district court ruled that Luna procedurally defaulted on this claim by failing to raise it on direct appeal.

But unlike on the previous claim, Luna makes no attempt on this one to excuse his procedural default or to show that failure to consider this claim would work a fundamental miscarriage of justice. That alone means we should

No. 19-70002

deny a COA. *Norman v. Stephens*, 817 F.3d 226, 231–32 & n.2 (5th Cir. 2016); *see also Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

In any event, even if his default were excused, Luna's *Witherspoon* claim is not reasonably debatable. Prospective jurors in capital cases cannot be dismissed for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522. Exclusion is proper only if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotation omitted).

To be sure, for much of the challenged juror's voir dire testimony, he sounded like an ideal capital juror. He repeatedly stated that whether he could impose the death penalty would depend on "the circumstances" and that there would be "a lot of variables involved." He might, for instance, be "sway[ed]" if the victim was a child, elderly, or disabled, or if the crime was "heinous" or "brutal[]." The juror also said that the motive for the crime might influence him.

But at one point, he said that if the victim was not young, elderly, or disabled, he "really d[idn't] think" he could vote to impose the death penalty. And ultimately, his voir dire ended with the following:

> Q: And you were there, and you have found somebody guilty of capital murder beyond a reasonable doubt. And then you have heard whatever other evidence might be presented. And you knew that the answers to the questions were such that the result would be death, would you be able to do it?
>
> A: I'm sorry I'm so ambivalent, but I don't think I could.
>
> THE COURT: What was your answer? I don't think I could?
>
> A: I don't think I could.

The trial judge then granted the state's motion to strike the juror for cause.

10

No. 19-70002

Viewed against the juror's prior statements indicating a willingness to vote for the death penalty in appropriate circumstances, his last statements raise an ambiguity. And because the trial judge takes into account firsthand impressions of the juror's demeanor—impressions not apparent in an appellate record—we defer to the trial judge's resolution of that ambiguity. *Uttecht v. Brown*, 551 U.S. 1, 7, 9–10 (2007). Indeed, our review is "doubly deferential" because AEDPA adds another layer. *White v. Wheeler*, 136 S. Ct. 456, 460 (2015).[7]

That much deference means that reasonable jurists could not debate the merits of this claim. AEDPA requires deference to strikes for cause in cases with substantially less equivocation. *See White*, 136 S. Ct. at 459, 461–62 (holding that trial judge had discretion to strike juror who said he could not be "absolutely certain" that he could consider the death penalty, but later "expressed his belief that he could consider all the penalty options"); *Uttecht*, 551 U.S. at 15–17 (holding that juror's answers "on their face" permitted trial court to strike juror for cause, when juror "stated six times that he could consider the death penalty or follow the law" but interspersed those statements with "more equivocal" ones about how he would have to give it "some thought"). We accordingly deny a COA on this claim.

## D.

Luna's last claim is a challenge to the constitutionality of Texas's jury instructions for capital cases. To impose a death sentence, a Texas jury must

---

[7] Luna argues that the district court erred in applying section 2254(e)(1) of AEDPA, under which a state court's findings of fact are presumed correct, a presumption that can be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). According to Luna, section 2254(d)(2)—which requires deference unless the state court's finding was "unreasonable"—should apply to *Witherspoon* claims. But this court recently deemed it "prudent" to apply both subsections. *Smith v. Davis*, 927 F.3d 313, 324 (5th Cir. 2019). We ultimately need not define the degree of deference with exactitude because its precise articulation does not make a difference in this case.

answer "yes" on a future dangerousness question and "no" on a mitigation question.    TEX. CODE CRIM. PROC. art. 37.071.    Luna challenges the jury instructions on the mitigation question.    Texas courts instruct capital juries that they must answer the mitigation question.    A "no" answer must be unanimous, and at least 10 jurors must agree on a "yes" answer.  *Id.* § 2(f).  If the jury is unable to reach an answer, the defendant receives a life sentence.  *Id.* § 2(g).  But Texas law forbids the court or counsel from informing the jury "of the effect of a failure of a jury to agree" on the special issues.  *Id.* § 2(a)(1).  Luna argues that jurors should be told about this possible outcome.

The Texas Court of Criminal Appeals, on direct appeal, rejected Luna's constitutional challenge to these instructions, as it has before.  *Luna v. State*, 268 S.W.3d 594, 609 & n.40 (Tex. Crim. App. 2008).  This court, too, has already held that three of the Supreme Court cases Luna raises do not clearly establish that the jury must be informed of the effect of its inability to reach an answer.  *See Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011) (holding that *Caldwell v. Mississippi*, 472 U.S. 320 (1985), does not implicate Texas's capital jury instructions); *Hughes*, 412 F.3d at 594 (rejecting challenge based on *Mills v. Maryland*, 486 U.S. 367 (1988), and holding that "no clearly established federal law calls into doubt the Texas death penalty statute"); *Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993) (rejecting challenge based on *Andres v. United States*, 333 U.S. 740 (1948), under analogous *Teague* doctrine).

Luna does rely on two Supreme Court cases this court appears not to have addressed in considering this question, but neither debatably establishes clearly established law undermining Texas's capital jury instructions.  Luna cites a portion of *Wiggins v. Smith* that refers to the standard for showing prejudice in ineffective-assistance claims arising from capital cases—namely, a reasonable probability that at least one juror would have voted against death.  539 U.S. 510, 537 (2003).    That says nothing about what must be

communicated to a capital jury. And *Jenkins v. United States*, 380 U.S. 445 (1965), is "off the table as far as [AEDPA] is concerned" because it was based on the Court's supervisory powers over federal courts, not the Constitution. *Early v. Packer*, 537 U.S. 3, 10 (2002).

We thus deny a COA on Luna's challenge to Texas's capital jury instructions.

\* \* \*

We GRANT a COA on Luna's claim for ineffective assistance of trial counsel during the investigation and presentation of mitigating evidence. We DENY COAs on Luna's other claims.