**REVISED SEPTEMBER 16, 2014**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 94-20403

———————————————

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

WILLIA ALLEN, LLOYD SWIFT and
FRANK C. CIHAK,

                              Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Southern District of Texas

———————————————

February 27, 1996

Before REAVLEY, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    This case involves an elaborate series of interlocking schemes to defraud various banks, particularly First City National Bank of Houston, of substantial sums of money.  A grand jury returned a 34-count indictment against Frank Cihak, Lloyd Swift, and Willia Allen.  After an eight week trial, the district court dismissed one of the counts and submitted the remaining 33 to the jury.  The jury found the defendants guilty on all counts.  The district court sentenced Cihak to 151 months imprisonment, five years supervised release, and an $800,000 fine.  Allen received 70 months imprisonment and five years supervised release.  The court

sentenced Swift to 87 months imprisonment and $197.674.71 in restitution payments to the FDIC. The defendants appeal their convictions and sentences. We affirm.

I

We provide here a brief overview of the schemes exposed at the trial. We begin by identifying the characters and outlining the structure of the orchestrated scams. We then summarize the events in rough chronological order.

A

1

The activities of defendant Frank Cihak lie at the center of this case. In the early 1980s, Cihak was a Chicago banker. Through holding companies, he controlled or owned a substantial interest in several Illinois banks, including Worth Bank & Trust, Mount Greenwood Bank, and First National Bank of Danville. Cihak held high-level management or board positions at many of these banks and maintained offices at most of them. In the middle of the 1980s, Cihak became involved in the recapitalization of the failed First City National Bank of Houston, the largest of a number of banks owned by a holding company called First City Bancorporation. The principal figure in the First City recapitalization was Robert Abboud. Cihak organized the nuts and bolts of the recapitalization and assumed the number two position at First City Bancorporation and Bank upon its completion.

Joseph Fahy was a New York City securities dealer. Throughout the 1980s, he operated several businesses, including STS Holding

Corp. and Fahy & Co., which attempted to generate funds through municipal securities and automobile loan transactions. Although Fahy testified for the United States at trial under a subpoena, a grant of immunity did not improve his poor memory of the events involved.

David Lucterhand was a Chicago businessman who began as a dealer on the Chicago Board of Options Exchange. In the 1980s, Lucterhand operated businesses called the Lucterhand Group, Inc. and L.L. Chandos Co. Lucterhand initially attempted several business deals with Fahy. In desperate financial straits as a result of these deals, he turned to Cihak for help in finding a way to generate funds. Cihak eventually arranged for First City Bank to hire Lucterhand as a consultant. Lucterhand testified on behalf of the United States at trial under a grant of immunity.

Defendant Lloyd Swift was a horse breeder with a farm in Missouri. He ran a horse trading operation and other businesses including Swift Thoroughbred, Swift Farms, and Swift Implement Co. Swift also possessed considerable knowledge of automobile sale and loan transactions. In the late 1970s and early 1980s, the market for thoroughbreds crashed, and Swift's financial situation deteriorated. Cihak eventually arranged for First City to hire Swift as a consultant on automobile matters.

Defendant Willia Allen was an accountant who owned and operated her own accounting firm, Allen & Associates. Allen was not a CPA. Together with another individual, Allen bought a company called Shepherd Fleets, which eventually held Dollar Rent-

A-Car franchises in at least three cities. Allen also owned a construction firm called Combined General Contractors. Allen possessed some knowledge of bank obligations under the Community Reinvestment Act, a federal statute designed to encourage banks to lend funds to lower income businesses and individuals in the banks' communities. Cihak arranged for First City to hire Allen as a consultant on CRA matters.

The Cochonours were a wealthy Chicago family. Two Cochonour brothers, Don and Robert, had extensive dealings with Swift's horse businesses. At one time, the two brothers also owned a percentage in Tri-Star Cablevision, Inc.; Cihak claimed an interest in this company as well.

2

According to the government, Cihak used two principal methods to divert funds from First City bank to his own use. In the first method, Cihak used his position at First City to have that entity hire Lucterhand, Swift, and Allen as consultants. Cihak had these consultants bill First City for substantial sums of money in consulting fees. Cihak approved the invoices, and First City paid them. The consultants normally transferred the proceeds of these fees from accounts in their names at First City to accounts in their names at one of Cihak's Chicago banks, in order to avoid the watchful eyes of First City auditors. Once the funds were out of Houston, the consultants transferred a portion of their fees to Cihak. These kickbacks occurred either when a consultant wrote a check to Cihak or authorized an internal transfer, or when Cihak

4

used his position at the Chicago banks to transfer the funds to himself on his own.

In the second method of defrauding the First City entities, Cihak used his position to arrange for First City Bank to fund various loans to Lucterhand, Swift, and Shepherd Fleets. Cihak then either diverted the funds generated to his own use or received bribes from the borrowers. In Lucterhand's case, Cihak used the funds generated from the consulting fees to pay back these loans.

B

This story begins in the early 1980s. From 1982 through 1985, Cihak persuaded the boards of directors of two of his Chicago banks, Mount Greenwood and First of Danville, to loan federal bonds of large face value to Fahy. Fahy represented that he would deposit these bonds in an account at a different corporation, where they would remain to serve as the regulatory capital necessary for Fahy to operate his securities dealing businesses, primarily STS. First of Danville and Mount Greenwood together loaned Fahy bonds with a total face value of $2,000,000. The bonds did not remain in the corporate account as promised; instead, Fahy sold the bonds or borrowed against them and used the funds generated for, in his words, "legal fees, accounting fees, salaries, travel and entertainment and . . . those arenas."

When Mount Greenwood and First of Danville began to demand the return of the bonds, or the money that should have been generated from their maturity, Cihak secretly arranged to pay back the banks himself. He had Fahy open a custodial trust account at Worth Bank

5

& Trust in the name of STS.  This account became one of the primary conduits for the funds generated by the frauds involved in this case.

In November of 1986, Cihak personally attempted to borrow $1,600,000 from Citibank in New York, representing that he would invest the funds generated in an auto receivables company.  As collateral, Cihak offered two purported letters of credit in his favor, one from Mount Greenwood and one from Worth, each in the amount of $800,000.  To support the letters, Cihak presented purported bank documents, including board minutes memorializing the authorizations of the letters of credit.  On the strength of the letters of credit and supporting documents, Citibank funded the loan in full.  The letters of credit and the supporting documents were fraudulent.  Each letter bore the forged signature of Randall Ytterberg; although Ytterberg was at various times involved with Mount Greenwood and the holding company that owned some of the Chicago banks, he did not have authority to sign letters of credit for either bank in November, 1986.  Neither bank board ever authorized the issuance of the letters of credit.

Apparently still short of funds necessary to resolve the Fahy problem, Cihak orchestrated a certificate of deposit scam at Worth in late 1986 and early 1987.  Using various brokers, Cihak offered jumbo CDS in the amounts of $99,000 and $100,000.  Cihak represented that these CDS belonged to Worth, a federally insured bank.  Several pension funds and other investors deposited large amounts into the Worth STS trust account.  Cihak then diverted the

money to his own use. Using his position in the Worth management, Cihak had subordinates prepare false account documents for each CD. Cihak paid the interest on the CDS and eventually returned the principal to the investors when the CDS "matured" one or two years later.

Using the money from the Citibank loan and the CD scam, Cihak resolved the Fahy debt to First of Danville and Mount Greenwood. Cihak funneled the Citibank money through the Worth STS trust account and bought back the Fahy bonds that had not yet matured. He returned these bonds, together with the cash supposedly representing the money from the mature bonds, to Mount Greenwood and First of Danville.

Cihak renewed his contact with Lucterhand in Chicago at around this time. Lucterhand initially became involved with STS, but when the Fahy business ventures failed, Lucterhand's financial situation became desperate. In late 1987, Cihak arranged for Mount Greenwood to loan Lucterhand $15,000 without adequate supporting documents or collateral. When Lucterhand was unable to pay back the loan, Cihak arranged for a $5000 good faith payment on the loan. In return, Cihak had Lucterhand open a custodial trust account at Worth and sign a form authorizing Cihak to control the account. Thereafter, Cihak had Lucterhand bill First of Danville $3000 per month, although Lucterhand was providing no services to that bank.

By this time, Cihak was heavily involved at the recapitalization of First City Bank in Houston. In January, 1988, Cihak presented Lucterhand with a check for $96,500 from First City

7

Bank to the Lucterhand Group. Cihak had Lucterhand endorse it and deposit the funds into the Worth Lucterhand trust account. At the time, Lucterhand had done no work for First City Bank, and in fact, had never been to Houston. Cihak funneled most of this money through the Worth STS trust account to Citibank to pay off the Citibank loan. Cihak suggested that Lucterhand come to Houston to work as a consultant at First City. Lucterhand did so. The two began a pattern of kickback payments. Lucterhand billed First City for consulting fees and Cihak approved the invoice; Lucterhand then deposited the money into his own First City account and transferred it to the Worth Lucterhand trust account, where Cihak diverted most of the funds to his own use.

Beginning in early 1988, Cihak arranged for First City to hire Allen as a consultant. Using information already available to the general public, Allen compiled three volumes of information relevant to First City Bank's duties under the Community Reinvestment Act and gave a seminar on the same subject. For these services, she billed First City Bank over $425,000 in a series of invoices beginning in April of 1988. Cihak approved most or all of the Allen invoices. Allen deposited the money generated by the First City checks into her First City Bank account and moved the funds into a Worth checking account in the name of Allen & Associates. She then transferred to Cihak well over one fourth of the money she earned.

Also in early 1988, Cihak arranged for First City Bank to hire Lloyd Swift as a consultant to examine the bank's automobile

8

accounts. Swift arranged a sale of a large and suspect automobile loan portfolio for $.97 on the dollar and began to liquidate First City Bank's stock of repossessed automobiles. Swift and Cihak then began kickbacks. After Cihak approved a Swift invoice and First City wrote a check, Swift deposited the money into a First City Bank account in the name of one of his businesses. Swift moved a portion of the money to one of the various accounts that Swift or his businesses held at Worth, and transferred a substantial percentage of the proceeds to Cihak's personal account at Worth or to other Cihak accounts at other banks.

In the summer of 1988, Cihak arranged for First City to loan Allen and another investor $686,000, without proper loan documents, to buy Shepherd Fleets. Shepherd Fleets eventually owned Dollar Rent-A-Car franchises in three cities. Under Cihak's direction, First City Bank funded this loan out of a department that did not normally deal in loans of this type and in spite of the fact that neither Allen nor her partner had any experience in the car rental business. The Shepherd Fleets business was a disaster. The company had debts of over $400,000 not disclosed at the time of the purchase, and Allen succeeded in siphoning off hundreds of thousands of dollars of Shepherd Fleets money to her own fledgling construction company, Combined General Contractors. Under Cihak's direction, First City Bank increased the loan to Shepherd Fleets to $960,000 on the strength of financial statements in which Allen falsely represented herself to be a CPA and forged signatures of CPAs on the staff of Allen & Associates. When Shepherd Fleets

9

plunged further into debt, First City increased the loan by $400,000 more to cover overdrafts it had already honored, again on the strength of documents in which Allen falsely represented herself to be a CPA. First City Bank never recovered most of this loan. As part of his reward for his role in this transaction, Cihak received a Cadillac from the Shepherd Fleets stock.

In the middle of 1988, Cihak began receiving pressure from Citibank to pay off the $1,600,000 loan. In August of the same year, Cihak had Lucterhand borrow $1,800,000 from First City Bank. Under Cihak's direction, First City Bank made the loan without the financial statements normally necessary for a loan of that size. To provide collateral for the loan, Cihak and Lucterhand produced false documents purporting to memorialize a fictional transaction in which Lucterhand purchased a set of condominiums from the FSLIC and resold them to a Japanese investor named Hui-Nan Lin at a large profit. These documents bore the forged signature of Randall Ytterberg, an attorney named Ken Young, and another attorney named John Wu.

Cihak had Lucterhand open an account at First City Bank and used his position as a bank officer to exercise control over this account. After instructing First City Bank underlings to fund the Lucterhand loan with deposits into this account, Cihak wired over $1,200,000 of the money to the Worth Lucterhand trust account, after which Cihak wired the money to his personal account at Citibank to pay off his loan there.

Upon completion of this transaction, and under pressure from First City Bank officials, Cihak arranged documentation to support the Lucterhand loan. Cihak introduced Lucterhand to Allen. In a three-hour meeting with Lucterhand, Allen took down false financial figures that Lucterhand provided to her orally; Lucterhand changed the figures when Allen's facial expressions and body language suggested that they were insufficient to support the loan. Lucterhand provided no underlying tax or other documentation to support the figures he gave to Allen. Allen took these fabricated financial figures and prepared false financial statements for him and his businesses, documentation to justify the already funded loan. Allen forged the name of a CPA in her firm to engender confidence in the financial figures.

Each time a payment became due on the Lucterhand loan from First City Bank, Cihak had Lucterhand invoice the bank for amounts large enough to cover the loan payments. Cihak approved the invoices. In this manner, Lucterhand was able to "pay back" the loan.

Also in August, 1988, Cihak arranged for First City Bank to loan Swift $300,000 despite the absence of the usual documentation. In November, 1988, Cihak had First City Bank increase this loan by $650,000, and in January of 1989 arranged another $65,000 increase. A portion of these funds was diverted to Cihak's use. At the time, Swift stated that the loan would be secured by a first mortgage on his farm in Missouri, but he failed to provide appropriate appraisals and title documents. When Swift did provide loan

11

documents, they failed to disclose the fact that Swift already owed over $1,000,000 to the Cochonours. The documents also bore the forged signature of a CPA with Allen & Associates; Allen was Swift's accountant at the time. A title search on the Swift Farm found that at least two liens already existed on the Swift property and that First City's collateral was wholly inadequate.

In December, 1988, Cihak had to raise funds sufficient to pay back the principal on his bogus jumbo CDS. To help generate the necessary money, Cihak arranged for First City Bank to loan Lucterhand an additional $200,000. Cihak told Lucterhand to tell the bank's loan officers that the money was needed to pay taxes. After Lucterhand had deposited this money into the Worth Lucterhand trust account, Cihak moved it to the Worth STS trust account and used it to pay off the CD holders.

Later in 1989, under pressure from First City Bank officers, and under the threat of possible discovery by federal regulators, Cihak set about removing the Swift loan from the books of First City. Cihak arranged a transaction in which First City funded a dummy note from the Cochonours, which Cihak signed. Cihak used most of the money produced to pay off the Swift loan; around $170,000 of this money was wired to an account controlled by the Cochonours. The next day, the Cochonours purported to forgive Swift's outstanding million plus debt to them in return for a deed to the Swift farm, in spite of the fact that the farm's appraised value was significantly below $1,000,000. The Cochonours then purported to borrow over $1,000,000 from a business called Vinland

12

Property Trust and sought to use the farm as collateral. Cihak guaranteed the loan for the Cochonours, who never made a payment. Instead, Cihak made all of the payments through one of his businesses, Orland Enterprises. When Vinland discovered the shaky nature of the Swift farm collateral, Cihak pledged certain condominiums belonging to Orland Enterprises.

The various interlocking schemes began to unravel in late 1989, when federal regulators and internal bank investigators in Chicago examined certain of Cihak's transactions. To explain their activities, Cihak, Allen, Swift, and Lucterhand recounted an elaborate series of transactions. According to them, the money moving from Lucterhand to Cihak, and later from Cihak through the Worth Lucterhand trust account, represented a deal in which Lucterhand initially bought and then sold back to Cihak a portion of Orland Enterprises' interest in the mortgages on certain condominiums. The transfers from Swift to Cihak represented payments on a pre-existing loan from Cihak to Swift. The transfers from Allen to Cihak represented money that Allen actually owed to the Cochonours; the Cochonours simply asked Allen to pay Cihak in order to retire a pre-existing debt they owed to him.

II

The indictment charged Cihak with conspiracy, bank fraud, eight counts of wire fraud, eleven counts of misapplication of bank funds, two counts of making false statements to obtain loans, three counts of making false entries in bank records, six counts of money

13

laundering to conceal the proceeds of specified unlawful activity, and money laundering to promote specified unlawful activity. Allen was indicted for conspiracy, bank fraud, wire fraud, three counts of misapplication, making false statements to a bank, and money laundering to conceal the proceeds of specified unlawful activity. The grand jury charged Swift with conspiracy, bank fraud, two counts of wire fraud, three counts of misapplication of bank funds, making false statements to a bank, and two counts of money laundering to conceal the proceeds of specified unlawful activity. The district court dismissed one of the wire fraud counts against Cihak and Allen at the close of the evidence, and the jury convicted on all remaining counts.

Defendants here share three arguments. Their primary joint contention concerns the victim of their various frauds. Defendants argue that insufficient evidence established that they defrauded federally insured First City Bank, a federally insured entity, rather than First City Bancorporation, which was not. The second argument common to all defendants is that the evidence was insufficient to allow the jury to disbelieve the cover stories the defendants provided for the various transactions. A rational jury, the defendants argue, would have accepted these explanations. The third shared argument concerns the counts alleging money laundering to conceal the proceeds of specified unlawful activity. The defendants ask us to reverse these convictions on the ground that the funds allegedly laundered were not yet "proceeds" at the time of the laundering.

Defendant Cihak appeals his conviction and sentence on other grounds as well. He argues that certain of the wire transfers forming the basis for the wire fraud counts were not covered by the wire fraud statute because they were not in furtherance of the specified scheme to defraud, which was already complete at the time of the transfers. Cihak also uses this rationale to challenge his conviction for money laundering to promote specified unlawful activity. Cihak challenges one of his wire fraud convictions, on a charge stemming from the First City Bank loan to Shepherd Fleets, on the ground that insufficient evidence linked Cihak to this wire transfer. All of his convictions must fall, he argues, because the trial court abused its discretion on certain evidentiary rulings. Cihak further requests that we upset his sentence on the ground that the trial court miscalculated the amount of money involved in the various convictions. Finally, in an argument raised for the first time in their reply briefs, Cihak and Allen argue that the district court committed plain error by not submitting to the jury the issue of the materiality of their misrepresentations to First City Bank.

Defendant Swift challenges his conviction of conspiracy on the ground of fatal variance, arguing that the evidence at trial established nine separate conspiracies while count one of the indictment alleged a single conspiracy. Swift also claims that the trial court abused its discretion in proceeding with the trial on a day that Swift was unable to attend. Defendant Allen makes no other arguments.

15

Some defendants make certain other arguments. Cihak, for instance, argues that the record did not include evidence sufficient to allow the jury to conclude that his approval of the invoices was a factor in causing their payment, or that he attempted to conceal the proceeds of the kickbacks. We find no merit in these other arguments from Cihak, and given the clarity of the record on these questions,[1] we will not unnecessarily lengthen this opinion with a full discussion of them.

III

A

The primary grounds upon which the defendants rely to attack their convictions is sufficiency of the evidence to prove that First City National Bank, as opposed to First City Bancorporation, was the intended and actual victim of their illegal activities. The defendants' argument runs as follows. At the time of the schemes, the federal statutes covering misapplication of bank funds and falsification of bank records covered only activities designed to defraud certain listed institutions, and the lists of covered institutions included in these statutes did not include holding companies. See 18 U.S.C. § 656 (1988) (misapplication); 18 U.S.C.

---

[1]  As Professor Pamela Bucy has explained, the mens rea requirement for certain portions of the money laundering statutes can be less than stringent. See Pamela H. Bucy, Epilogue:  The Fight Against Money Laundering:  A New Jurisprudential Direction, 44 Ala. L. Rev. 839, 843 (1993).

16

§ 1005 (1988) (falsification).[2]  First City Bank, but not First City Bancorporation, was a federally insured entity.  Accordingly, the government had to introduce evidence sufficient to prove that the defendants defrauded First City Bank, not the holding company, in order to sustain convictions for misapplication and falsification.  The government did not do so.

The defendants further argue that the counts in the indictment alleging wire fraud, money laundering to conceal the proceeds of specified unlawful activity, conspiracy, and bank fraud, all depended in one way or another upon the allegations in the misapplication and falsification counts.  The defendants note that the wire fraud counts alleged that the fraud occurred in wire transfers designed to further the misapplication; the money laundering allegedly concealed the proceeds of the misapplication; the conspiracy count recited misapplication and falsification as among objectives of the conspiracy; and the bank fraud count alleged as part of the scheme a series of transactions to defraud First City by misapplying its funds.  See 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956(a)(1)(B)(I) (money laundering to conceal the proceeds of specified unlawful activity).  The defendants argue that any variation as to the victim of the frauds between the scheme alleged in the indictment and that proved at trial

_____

[2]  In 1989 and 1990, Congress amended some of the statutes at issue in this case to cover activities directed against holding companies of federally insured depository institutions. See, e.g., Pub. L. No. 101-73, § 962, 103 Stat. 501-03 (1989); Pub. L. No. 101-647, § 2595, 104 Stat. 4906-07 (1990).

17

constituted a fatal variance; that the wire transfers could not constitute wire fraud because the underlying transaction furthered by the transfer, the alleged misapplication, was not itself illegal; and that the jury may have convicted on the conspiracy and bank fraud counts on the legally insufficient grounds that the defendants designed a scheme to misapply bank funds and falsify bank records.

In addition, citing United States v. McDow, 27 F.3d 132, 135-36 (5th Cir. 1994), the defendants argue that even if their scams did in fact harm First City, the government introduced insufficient evidence to allow a rational jury to find that they knew they were defrauding a bank. Accordingly, the defendants ask us to reverse their convictions on the ground that no rational jury could infer that they possessed the necessary criminal intent.

In response, the United States does not take issue with any of the defendants' legal reasoning or inferences. The government argues only that the evidence at trial was sufficient to allow the jury to find that the defendants intended to and did defraud the bank, at least temporarily. We reach only the narrow question of whether sufficient evidence established that the defendants intended to and did deprive First City Bank of its funds. We answer this question affirmatively.

Most of the alleged misapplications and falsifications occurred in the context of the kickbacks of the consultants' fees, in which Swift, Allen, and Lucterhand provided invoices for consulting services and transferred a percentage of the resulting

18

payments to Cihak. The government introduced copies of the checks issued to the consultants into evidence at trial. The face of these checks all bore the label "First City National Bank of Houston;" none of them mentioned the holding company or any other entity as the signing party or the owner of the funds in the account corresponding to the checks. All of the checks were signed, and underneath the signatures on some checks was the identifier "Vice President and Cashier." Nothing on the face of the check identified the instrument as a cashier's check or anything other than a First City Bank check signed by a First City Bank officer. Cf. United States v. Schultz, 17 F.3d 723, 726 n.7 (5th Cir. 1994) (deeming an FDIC logo on one of 1200 checks insufficient to establish that the bank cutting the check was federally insured).

In addition, all of the checks were drawn on account number 80-90017. Government rebuttal witness Vernon Pool, First City Bank's vice-president and manager in charge of accounts payable, testified that this account held the funds of First City Bank. Pool agreed that the holding company ultimately reimbursed the bank for the consultant's fees at the end of each month, but maintained that all of the consultant fees for all of the entities owned by the holding company were initially covered by the bank, which then sought reimbursement from the proper entity within the holding company or from the holding company itself.

The defendants attempt to minimize the importance of Pool's testimony by labeling Pool a "surprise rebuttal witness" and by

19

attempting to show how his testimony conflicted with that of other government witnesses. The record includes no defense objection when the government announced its intention to call Pool and informed the court in the presence of defense counsel of the evidence he would provide; in any case, the trial court did not abuse its discretion in allowing Pool to testify. Moreover, Pool's testimony did not contradict that of the few other witnesses who testified that the consultant's fees were charged to the holding company or some other entity within it. Pool agreed that the holding company ultimately bore the costs of the defendants' schemes, but stated that all of the consultants were initially paid with First City Bank's funds. No evidence suggested that any of the witnesses allegedly contradicting Pool had ever seen the face of the consultant checks themselves.[3]

Defendants also rely heavily on the theory that the arrangement described in Pool's testimony violated federal statutes governing a bank's lending relationship with its holding company and other affiliated entities. See 12 U.S.C. § 371c(c) (requiring that loans from a bank to an affiliated entity be secured by specified collateral); 12 U.S.C. § 371c-1(a)(1)(A) (requiring

_____

[3] Defendant Cihak also makes much of the testimony of several witnesses that the consultants' expenses were charged to various "cost centers" corresponding to the holding company or to other entities within it but not to the bank. The evidence at trial established, however, that these cost centers were merely accounting devices to keep track of which entity should ultimately be charged for which expense. The cost centers had nothing to do with whose money was actually in account 80-90017. The fact that all of the consultants' checks were drawn on the same account, in spite of being charged to different cost centers, supports Pool's testimony that the bank initially paid all of the consultant fees.

transactions between a bank and its affiliate to be on market terms).  Defendants' arguments are unpersuasive for several reasons.  First, the record includes no testimony establishing any arrangement between the bank and the holding company regarding the payment of the consultant fees, beyond the fact that reimbursement occurred at the end of each month.  For all the record discloses, the bank and the holding company did have a deal consistent with these banking statutes.  We decline the defendants' invitation to equate a silent record with one affirmatively showing a violation of federal law.  Second, even if the record did disclose that the arrangement Pool described violated federal statutes, this fact would at most create a jury question as to the credibility of Pool's testimony.  A rational jury may certainly believe testimony establishing a violation of a federal statute.

United States v. McDow, 27 F.3d 132, 135-36 (5th Cir. 1994), does not support defendants' argument of insufficient evidence of criminal intent.  In McDow, a defendant prosecuted under 18 U.S.C. § 1014 made fraudulent statements in a mortgage application to a mortgage company owned by a federally insured bank.  The government did not have to prove that the defendant knew that his intended victim was a federally insured institution; it did have to prove that he knew he would victimize a bank.  We reversed the defendant's convictions in part because the government did not suggest how the McDow defendant might have acquired the knowledge that he was defrauding a bank as opposed to a mortgage company.

21

Two factual differences distinguish this case from McDow. First, the financial sophistication of the defendants in this case is, to say the least, greater than that of the McDow defendant. Here we have a lifetime banker, an experienced financial consultant, and an accountant, all with extensive knowledge of banks, loans, consultant fees, and checks. The jury could infer much from the fact that Cihak, Swift, and Allen, in contrast to the McDow defendant, were not members of the "public generally," and that they had "particular expertise in banking matters." 27 F.3d at 136. Second, nothing in the McDow opinion suggests that the defendant in that case received documents notifying him that he was dealing with a bank. In this case, in contrast, the checks themselves bore only the name of First City Bank, and some identified the signing party as a First City Bank official. Although the defendants seek to avoid the force of this evidence by analogizing these checks to cashier's checks, they produced no evidence to support this contention at trial, and indeed did not argue the intent issue below. To discover the victim of their schemes to defraud, these financially sophisticated defendants had to look no farther than the face of the checks. We hold that the evidence was sufficient to allow a rational jury to find that the defendants intended to deprive First City Bank of its funds temporarily.

The second argument common to all defendants is that no rational jury could fail to believe the explanations for the transfers of funds. We disagree.

The jury had ample ground to disregard the cover stories, and we pause here to note only some of the reasons. The cover story transactions were memorialized by post hoc documents, the creation of which was prompted by internal bank investigations, or by no documents at all. The stories contradicted earlier statements given to First City Bank auditors that Swift, Cihak, and Allen had no business dealings with one another. None of these transactions were ever disclosed to First City Bank, in spite of bank rules requiring disclosure. In several cases, the numbers in the financial transactions alleged in the cover stories did not match the flow of funds documented in the bank records. In one explanation, defendant Swift simply forgot that he had already paid a $1,000,000 debt to the Cochonours at the time he took out a loan, in spite his impressive recall of exculpatory details, and in spite of the fact that Swift testified otherwise before the grand jury. The cover stories, and the documentation provided to support them, changed over time as bank investigators and federal prosecutors confronted the defendants with emerging details. The flow of the consultant fees was circuitous, with money taking unnecessary trips through Chicago banks, suggesting that the defendants sought to hide their scheme from First City auditors, who would have no access to the records of other banks. Cihak repeatedly arranged

for First City to fund loans in the total absence of supporting documentation to highly suspect business ventures and against the judgment of the relevant loan officers. To support these loans, Allen created post hoc financial statements, statements fabricated in the total absence of the necessary tax and other records. Allen admitted in her grand jury testimony that she forged the signatures of several Allen & Associates CPAs and falsely represented herself to be a CPA in these statements. The story covering the kickbacks from Allen to Cihak depended on the bizarre contention that the Cochonours suddenly needed $150,000 to pay off a debt to Cihak not due for at least another five years, this in the face of uniform testimony from several witnesses, including the defendants, that the Cochonours' financial position was such that they could have borrowed or paid this amount of money with ease at any point during the relevant events. A rational jury could disregard such stories.

C

The final argument common to all three defendants is the contention that their convictions for money laundering to conceal the proceeds of unlawful activity may not stand because the funds at issue were not yet proceeds at the time they were laundered. See 18 U.S.C. 1956(a)(1)(B)(I) (making unlawful transactions designed to conceal the origin of the "proceeds" of unlawful activity). This attack concerns counts 28-33 of the indictment. It is without merit.

Counts 28-31 all involved the kickback of the consultant fees from Lucterhand, Swift, and Allen. In each of the transactions

24

corresponding to these counts, the consultant invoiced First City Bank, Cihak approved the invoice, the Bank issued a check, and the consultant deposited the check into an account at First City Bank in the name of either the consultant or one of the consultant's businesses. The consultant then transferred the money from the First City Bank account into an account at Worth. From the Worth accounts, the consultant kicked a portion of the funds back to Cihak. The defendants argue that the illegality of the transaction stemmed from their failure to disclose to First City that a portion of fees charged in the invoice was to benefit Cihak. See 18 U.S.C. § 656 (misapplication of bank funds); 18 U.S.C. § 1344 (bank fraud). Therefore, the defendants argue, the money could not constitute proceeds of a misapplication or fraud until the moment Cihak received the benefit of the funds. Since the transactions specified in the indictment took place before this moment, they could not constitute laundering of the proceeds of illegal activity.

Counts 32 and 33 concerned the First City Bank loan of $1,800,000 to Lucterhand, which Cihak used for his own purposes. After First City Bank funded a portion of this loan, Cihak had Lucterhand transfer $300,000 of the money from Lucterhand's account at First City Bank to the Worth Lucterhand trust account. Cihak used his position at Worth to transfer this $300,000 through his personal account at Citibank to Citibank in repayment of his $1,600,000 loan. In June, 1990, a payment on the First City Bank loan came due. Lucterhand notified Cihak, then invoiced the bank

25

for a consulting fee.  After Cihak had approved the invoice, Lucterhand deposited the resulting First City Bank check into his account at the bank.  Lucterhand ended up transferring $112,515.84 of this fee to the bank as a payment on the loan.  Count 32 alleged that the transfer of the $300,000 from Lucterhand's First City Bank account to the Worth Lucterhand trust account constituted money laundering.  Count 33 recited an identical charge in the transfer of the $112,515.84 from Lucterhand's account at the bank to the bank in repayment of the loan.

Defendants' contentions fail because the funds at issue in each of the transactions became proceeds at the moment the money left the control of First City Bank and was deposited into an account of a consultant or borrower.  See United States v. Cauble, 706 F.2d 1322, 1254 (5th Cir. 1983) ("[T]he crime [of misapplication] is complete at the time the misapplication occurs.") (alterations added), cert. denied, 465 U.S. 1005 (1984).  Suppose, for example, a consultant and a bank officer agree to an invoice and kickback scheme, but the consultant decides to cheat by keeping all the money and making no kickback.  The two would have perpetrated a fraud against the bank.  The bank officer in this example participated in the scheme by approving the invoice with intent to defraud.  The dishonor among thieves is not relevant, certainly not to the bank.[4]

---

[4]  The only problem created by a refusal to kick back is evidentiary, not legal.  The government might have more difficulty convincing a jury that a bank officer approved the invoice with intent to defraud, when the bank officer never received the benefit of the alleged scheme.  If the government were able to solve this

26

As this hypothetical illustrates, the fraudulent scheme produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators. Had Swift, Lucterhand, and Allen refused to kick back money to Cihak, they nonetheless would have been guilty. Accordingly, the money produced from the defendants' fraud became proceeds when it left the control of First City Bank and came into the possession of one of the consultants. The jury could infer, from the circuitous nature of the subsequent transactions as well as the other evidence in the case, that the flow of funds recited in the indictment was designed to conceal the fact that these funds were proceeds of fraud from First City Bank internal auditors and from federal regulators.

For similar reasons, the defendants' implication that First City Bank did not overpay the consultants, who performed valuable services for the bank and First City Bancorporation, is beside the point. If, as the jury found, the defendants perpetrated a kickback scheme, then by definition the consultants were willing to perform these tasks for less money than they actually charged. The bank, not Cihak, should have been the beneficiary of consultants' willingness to do the job for less.

Nothing in our resolution of this case conflicts with <u>United States v. Johnson</u>, 971 F.2d 562, 567-70 (10th Cir. 1992). In <u>Johnson</u>, the defendant convinced several investors to dedicate

evidentiary problem, for instance, by taping conversations between the consultant and the bank officer, no legal principle would bar a conviction of fraud or misapplication.

27

millions of dollars to a non-existent currency exchange business. Some of the investors wired their funds from their own bank accounts to that of the defendant. The indictment charged a violation of 18 U.S.C. § 1957, which renders unlawful the knowing execution of a transaction involving more than $10,000 of the proceeds of illegal activity, alleging that the deposit of the funds from the investors into the defendant's account as a result of the wire transfer violated the statute. The Tenth Circuit reversed the defendant's convictions under section 1957, holding that the wire transfers did not involve proceeds of criminal activity because the money did not become proceeds until the wire transfers, which did constitute wire fraud, were completed.

The difference between Johnson and this case is in the timing of the wire transfers. The Johnson court held, in essence, that the money at issue did not become proceeds until it left the account of the victims and reached the account of the defendant. The wire transfers were the means by which the funds made this journey and thus occurred too early to form the basis of a money laundering conviction. In this case, the consultant fees and loans left the control of First City Bank and reached the accounts of the conspirators before the wire transfers occurred. The wire transfers distributed the proceeds among the various defendants and helped hide the fraud from First City auditors and federal regulators.

28

Cihak makes several arguments unique to his convictions. None have merit.

Cihak attacks two of his convictions for wire fraud and one of his convictions for money laundering to promote specified unlawful activity on the ground that the wire transfers and the transaction specified in the indictment did not further the fraud. We disagree.

Count 10 concerned the $1,600,000 loan that Cihak obtained from Citibank upon the strength of the two fraudulent letters of credit from Worth and Mount Greenwood. To repay these loans, Cihak had Lucterhand borrow $1,800,000 from First City. Cihak, either on his own or through Lucterhand, wired approximately $250,000 of the proceeds of this first Lucterhand loan to the Worth Lucterhand trust account, for use in repaying the Citibank loan. Count Ten charged that this wire transfer furthered a fraud against Citibank. See 18 U.S.C. § 1343.

Counts nine and 34 concerned the CD scam. Shortly before several of the fake CDS matured, Cihak had Lucterhand borrow an additional $200,000 from First City Bank. Cihak, either on his own or through Lucterhand, wire transferred this money into the Worth Lucterhand trust account, where he moved it to the Worth STS trust account to use to repay the principal on the now matured CDS. Count nine alleged that this wire transfer furthered a fraud against Worth. Count 34 alleged that the movement of the funds

through the Worth trust accounts constituted money laundering to conceal the proceeds of and promote the carrying on of specified unlawful activity.  See 18 U.S.C. § 1956(a).

Cihak attacks all three of these convictions on the ground that the fraud inherent in these transactions had been completed by the time any wire transfer or money laundering had occurred.  He thus contends that the evidence was insufficient to establish that the wire transfers and laundering furthered a scheme to defraud.

Read broadly, Cihak's argument amounts to the proposition that acts occurring after the defrauding defendant already controls the proceeds of the fraud may never further the fraud.  Circuit precedent in the closely analogous mail fraud setting squarely forecloses this sweeping contention.  See United States v. Bowman, 783 F.2d 1192, 1197 (5th Cir. 1986) ("'[I]t is a well-established principle of mail fraud law that use of the mails after the money is obtained may nevertheless be "for the purpose of executing" the fraud.'") (alteration in original) (quoting United States v. Ashdown, 509 F.2d 793, 799 (5th Cir.), cert. denied, 423 U.S. 829 (1975)); see also, e.g., United States v. Bruno, 809 F.2d 1097, 1104 (5th Cir.) ("[C]ases construing the mail fraud statute apply to the wire fraud statute as well.") (alteration added), cert. denied, 481 U.S. 1057 (1987).

Read more narrowly, Cihak's contention is that the use of the wire transfers, and the laundering of the money, did not further the overall scheme.  See Schmuck v. United States, 489 U.S. 705, 712 (1989) (stating that the in furtherance requirement of the mail

30

fraud statute is satisfied if the use of the mails is "'incident to an essential part of the scheme'") (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)); cf. United States v. Maze, 414 U.S. 395, 402-05 (1974); United States v. Heaps, 39 F.3d 479, 484-86 (4th Cir. 1994). In assessing this argument, we follow Schmuck and begin with a careful analysis of the nature and scope of the scheme to defraud. See 489 U.S. at 711; see also Grunewald v. United States, 353 U.S. 391, 406-11 (1957) (considering carefully the scope and purpose of a conspiracy in establishing its duration and in classifying which of several alleged overt acts furthered it). In this case, a rational jury could conclude that Cihak intended from the beginning to deprive Worth, the CD investors, and Citibank of the use of their money, not to steal the money permanently. In essence, Cihak defrauded his victims of the high interest rate corresponding to the risky making of an unsecured loan to pay a bad debt. The jury could conclude that Cihak returned this money to its rightful owners as part of his scheme to obtain its use and in order to avoid detection of his frauds.

We reject Cihak's argument. Repaying the CD investors and Citibank was an essential portion of Cihak's scheme. To do so, he used the wires and laundered money. In both cases, the illegal activities furthered the scheme to defraud.

At oral argument, defense counsel argued that actions designed solely to avoid detection, if taken after the defendant had control over the money produced by the fraud, could not by definition be in furtherance of a scheme to defraud. But all frauds depend upon

31

avoiding detection for at least a period of time sufficient to allow the perpetrator to escape apprehension. Moreover, both this court and the Supreme Court have recognized that actions taken to avoid detection, or to lull the fraud victim into complacency, can further the fraud, even after the victim has ceded its funds or goods to the perpetrator's control. See Maze, 414 U.S. at 402-03 (holding that the mailings at issue in a prior case met the in furtherance requirement because they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehensions of the defendants less likely than if no mailings had taken place"); Bowman, 783 F.2d at 1197 (holding that implementation of a "lulling scheme" satisfied the in furtherance requirement); United States v. Cavalier, 17 F.3d 90, 93 (5th Cir. 1994) (mail fraud); see also United States v. West, 22 F.3d 586, 591 & n.13 (5th Cir.), cert. denied, 115 S.Ct. 584 (1994).

B

Cihak's next argument concerns count eight, which alleged that Allen and Cihak committed wire fraud in connection with the First City Bank loan to Allen's car rental business, Shepherd Fleets. The wire fraud occurred after First City Bank extended a second loan to Shepherd Fleets on the strength of financial documents bearing the false representation that Allen was a CPA. Allen caused the proceeds of the second loan to be wired from First City Bank to a Shepherd Fleets account at a different bank. The indictment alleged that Cihak was responsible for this wire fraud

as well.  Cihak, but not Allen, appeals his conviction of this count, arguing that insufficient evidence established that Cihak knew that Allen submitted false documentation.  We disagree.

Cihak's relationship with Allen began long before April of 1989, when First City Bank funded the second Shepherd Fleets loan. Testimony at trial established that Cihak arranged for First City to hire Allen as a consultant in early 1988, and had previously referred several potential clients to Allen, including Swift. Shortly after the bank made the August, 1988 loan to Lucterhand, Cihak arranged for Allen to aid Lucterhand in manufacturing false financial documents to support the already funded loan.  At around the same time, Cihak arranged for First City Bank to fund a fraudulent loan to Swift based on financial papers bearing the forged signature of an Allen & Associates CPA.

In addition, Cihak had extensive involvement in the Shepherd Fleets loans themselves.  First City Bank loan officer M.G. Shetty, a government witness at trial, described Cihak's role in the Shepherd Fleets transactions.  After receiving a phone call on September 23, 1988, Shetty went to a meeting with Hamid Hamidanian, executive assistant to Cihak at First City Bank.[5] The purpose of the meeting was to discuss the funding of a loan to allow Allen and her business partner to buy Shepherd Fleets, a Chicago business that owned Dollar Rent-A-Car franchises.  The only documentation provided at the time was a fax from Allen and Associates to Cihak,

---

[5]    The jury heard testimony from several witnesses that Hamidanian was Cihak's right hand man.

33

which Hamidanian gave to Shetty, containing certain financial projections for Shepherd Fleets. Shetty prepared the first documents for a loan of $686,000, took them to Hamidanian, received them back with Cihak's initials on them, and the bank funded the loan the same day.

Shetty testified that this loan was fairly unusual. The loan was to a business with no Texas ties. Normally, Shetty did not handle loans of this size or to Chicago businesses. Financial statements for the business and documentation of collateral were not present. Neither Allen nor Thomas had previous experience in the car rental business. The revenue of Shepherd Fleets was small in comparison to the amount of the loan, and the business did not appear to be very profitable. The loan was to be funded the same day. Nevertheless, Shetty helped arrange to fund the loan because "this loan was originated by the senior management of the bank, Mr. Cihak. So we are very sensitive to this relationship since it is coming from the top."

In April of 1989, Shetty received a second phone call, this time from Allen. Allen told Shetty that Shepherd Fleets needed more money to buy another Dollar Rent-A-Car franchise and that Cihak had approved the loan. Shetty immediately called Hamidanian, who already knew of the proposed loan. The next day, Shetty participated in a meeting with Allen, her business partner, Hamidanian, and Shetty's immediate superior. In the middle of this meeting, Cihak stopped by to ask if everything was fine with the loan. Reluctantly, Shetty arranged for a second loan to be funded.

34

It was this loan that gave rise to Allen's submission of false documents and the subsequent indictment.

From these facts, the jury could infer Cihak's participation in the wire fraud. The jury could conclude that Cihak caused First City Bank to fund both of the Shepherd Fleets loans from his initials on the first set of documents, Allen's statement to Shetty that Cihak had already approved the second loan, Allen's fax to Cihak, Cihak's brief visit to the meeting involving the second loan to make sure that nothing was amiss, and the active participation of Cihak's executive assistant throughout the entire matter. The jury could infer that this loan was part of the payback to Allen for her participation in the kickback scheme. The jury could conclude that Cihak knew from their prior dealings that Allen was not a CPA. Finally, the jury could infer that Cihak knew that Allen would make false representations on her own loan documents, as Cihak had arranged for her to do in the documents accompanying the Swift and Lucterhand loans, and that Cihak intended to have the bank fund the loan in spite of these misrepresentations. In short, sufficient evidence linked Cihak to the second Shepherd Fleets loan transaction.

C

Cihak argues that all of his convictions must be reversed because the trial court abused its discretion with regard to evidentiary rulings regarding the admission of other bad acts and the impeachment of one of his witnesses. We reject Cihak's

35

contentions because any arguable error in the court's rulings was harmless.

1

Cihak argues that the district court misconstrued Fed. R. Evid. 404(b) in allowing the admission of several pieces of evidence. His primary attack centers on the evidence corresponding to count ten, which alleged that in 1988 Cihak committed wire fraud against Citibank while repaying the $1,600,000 loan he obtained upon the strength of two forged letters of credit from Worth and Mount Greenwood banks. Cihak's first argument is that the evidence of the forgeries themselves was inadmissible. We do not agree. The forgeries were the very fraud charged in count ten, and thus their creation and use were not prior bad acts within the meaning of Rule 404(b).

Cihak's second argument is that the trial court erred in admitting evidence of a different letter of credit in the amount of $1,400,000 purportedly issued from Worth to Acstar Insurance Company in 1991. The government concedes that Rule 404(b) governs the admissibility of this document but contends that the Acstar letter constituted evidence of modus operandi. We agree with the prosecution.

The Worth and Mount Greenwood letters issued to Citibank bore the forged signature of Randall Ytterberg, purportedly an officer of both banks. Ytterberg testified that his signatures were forgeries and that neither bank issued any such letters. A series of purported renewals of these letters of credit dated through 1987

36

also bore Ytterberg's forged signatures. The 1991 letter purportedly from Worth to Acstar bore Cihak's signature and another forgery of "Randall Ytterberg." Worth officer Joan Meyer testified that in response to a phone call from Acstar, she established that Worth never issued the 1991 letter. Upon further investigation, Meyer found the computer memory of the Acstar letter in the files of Kathie Ellis, Cihak's long-time secretary and administrative assistant. Given the fact that some of the Citibank letters and the Acstar letter issued from the same bank, bore the forged signature of the same bank officer, and went to benefit the same person, we hold that "the circumstances of the extraneous act were so similar to the offense in question that they evince[d] a signature quality -- marking the extraneous act as the handiwork of the accused." United States v. Sanchez, 988 F.2d 1384, 1393 (5th Cir.) (alteration added, internal quotation marks omitted), cert. denied, 114 S.Ct. 217 (1993); see also United States v. Brookins, 919 F.2d 281, 285 (5th Cir. 1990). The trial court did not abuse its discretion in admitting evidence of the Acstar letter.

2

Cihak next attacks certain testimony of Waseem Ahmad, an officer of Gruntal & Company. Gruntal was the company holding the bonds Fahy borrowed from First of Danville and Mount Greenwood at the beginning of the series of transactions covered by the indictment. Ahmad testified that his signature on a letter purportedly from him to Mount Greenwood and First of Danville officers verifying that Gruntal held $2,000,000 worth of bonds in

37

the name of Joseph Fahy was a forgery, and that in fact no such bonds were in Fahy's Gruntal account on the date of the letter.

The trial court committed no error in admitting this testimony. Although Ahmad's testimony may have concerned a prior bad act, a forgery, no evidence suggested that Cihak committed or had contemporaneous knowledge of this act. The letter was on the stationery of Fahy's company, STS, and bore Fahy's signature, not Cihak's. Regarding relevance, the forgery showed motive. The testimony verified that Fahy had converted the Mount Greenwood and First of Danville bonds to his own use, causing a potential $2,000,000 deficit in the accounts of the banks as a result of a loan that Cihak had suggested and championed in the banks' board meetings. This deficit was the motive for the Citibank loan and the CD scam, as Cihak sought to use fraud and his personal financial strength to make Mount Greenwood and First of Danville whole. Thus, Ahmad's testimony could not allow the jury to infer that Cihak was a forger because nothing suggested that Cihak forged this signature. Cihak could suffer little if any prejudice if the jury concluded that Fahy was a forger, and the evidence was otherwise relevant. See Fed. R. Evid. 403. No error occurred.[6]

---

[6] The defense might have been entitled to an instruction limiting the use of Ahmad's testimony to the issue of Cihak's motive, and clarifying that the jury should not use evidence that Fahy was a forger to infer that Cihak was a forger. The defense requested no such instruction; instead, Cihak asked the trial court to instruct the jury to disregard Ahmad's testimony entirely. The district court properly rejected this argument.

Cihak's next Rule 404(b) contention concerns the prosecutor's closing argument that Cihak accepted a bribe from the Cochonours in return for arranging a loan to the buyer of one of their companies, Tri-Star Cablevision. We find Cihak's reliance on Rule 404(b) unconvincing because his challenge is to argument, not evidence, and because he himself introduced the underlying evidence.

One of the government's witnesses was Les Cheatle, the president of First National Bank of Danville. Cheatle testified that in the early 1980s, First of Danville made a $900,000 loan to a Virginia limited partnership called Tri-Star Cablevision, Ltd., and that the funds were used to buy a corporation called Tri-Star Cablevision, Inc. The Cochonours were principal shareholders of Tri-Star, Inc., and Cihak signed many of the relevant loan documents on behalf of First of Danville. Cheatle further testified that if Cihak had benefitted from the loan to the buyer in this transaction, he should have disclosed this fact to the board of First of Danville before closing, and that Cihak had made no such disclosure at the time. Cheatle then published to the jury a document from Citibank's records, which Citibank received from Cihak, reciting that Cihak claimed an ownership interest in Tri-Star, Inc. worth around $150,000. The defense did not object to Cheatle's testimony, and no other government witness addressed the matter.

Cihak called Don and Robert Cochonour. Both Cochonours testified that although Cihak never owned shares in Tri-Star, Inc.,

they had agreed to pay him $200,000 as a fee or bonus for his months of work in finding a buyer for the corporation at a time when the brothers were anxious to exit the business. The sale of Tri-Star allowed the Cochonours to turn their investment in the corporation into cash. The Cochonours testified that they paid $50,000 of this "fee" at the time of the sale by check; years later, they memorialized the remaining $150,000 debt in a letter to Cihak, a copy of which the defense introduced at trial. Don Cochonour also testified that later in 1988, defendant Swift owed the Cochonours over $800,000 as a result of several horse transactions. Don Cochonour, believing Swift to be insolvent, sold this debt to defendant Allen, who believed that Swift would soon become solvent as a result of a loan she was helping to arrange from the State of Missouri. Allen bought the loans for $166,000. Cochonour asked Allen to pay Cihak directly in order to retire the remaining $150,000 debt still outstanding as a result of the Tri-Star transaction.

At closing argument, defense counsel contended that the kickbacks from Allen to Cihak were payments on this debt, in accordance with the Cochonours' testimony. At rebuttal, the prosecution argued that the $50,000 payment from the Cochonours to Cihak was a bribe, quid pro quo for Cihak's orchestration of the First of Danville loan to the Tri-Star buyer. The prosecution also argued that the promise to pay $150,000 never existed and was part of a cover story to conceal the Allen kickbacks. The defense

40

objected on Rule 404(b) grounds and moved for a mistrial; the district court overruled the objection and denied the motion.

The district court committed no error. Rule 404(b) applies to evidence, as the first word in its text suggests. Nothing in the text of the rule extends its scope to argument. Nor did the trial judge err in permitting the argument. Cihak, not the prosecution, introduced the evidence of the $50,000 payment from the Cochonours, and the prosecution's interpretation of the evidence constituted fair comment. Nothing in Rule 404(b) allows a defendant to introduce evidence, then cry foul when the prosecution turns that evidence against him, so long as the government's interpretation is not otherwise misleading. See United States v. Archer, 733 F.2d 354, 361-62 (5th Cir.) (holding that a defendant cannot use Rule 404(b) to contest cross-examination of her character witness regarding her previous acts of dishonesty when she questioned the witness as to her reputation for honesty), cert. denied, 469 U.S. 861 (1984).

4

Cihak's next evidentiary challenge concerns evidence regarding the transaction that Cihak arranged to remove the Swift loan from the books of First City Bank. In this transaction, Cihak arranged for First City Bank to fund a dummy note, which he alone signed, to the Cochonours in an amount sufficient to retire the Swift loan. The next day, a wire transfer arrived from a bank called Vinland Trust to retire the dummy note. Further evidence showed that the Vinland Trust wire transfer came from a loan from Vinland to the

Cochonours which Cihak guaranteed. Orland Enterprises, one of Cihak's businesses, made all of the payments on the Vinland loan. Cihak relies on Rule 404(b) to contend that the trial court erred in allowing government witness Richard Hendee, a First City Bank loan officer, to testify regarding a note allegedly memorializing a debt that the Cochonours owed to First City Bank in the amount of $1,150,000. The note was found in Vinland's files, and Hendee testified that there was no such note in the files of First City.

Cihak did object to Hendee's testimony, but not on Rule 404(b) grounds. He objected to the foundation for admitting the note. We review only for plain error, and find none.

5

Cihak's final evidentiary challenge concerns the impeachment of Glen Magnuson, former corporate counsel to First City Bancorporation. In response to the district court's ruling on a defense motion in limine, Cihak elicited the fact that Magnuson had previously been convicted of bank fraud. Over a defense objection, the prosecution established on cross-examination that Magnuson had defrauded First City entities during Cihak's tenure.

We refuse to reach the correctness of the trial court's ruling on this issue because we hold that any error was harmless beyond a reasonable doubt. From direct examination, the jury knew that Magnuson had worked for First City for a significant portion of his career, that he had since terminated his employment there, and that he had been convicted of bank fraud. The trial court properly admitted the evidence of the bank fraud for impeachment purposes,

42

see Fed. R. Evid. 609(a)(2), and the defense elicited the rest of this information. No testimony linked Magnuson to the specific frauds Cihak perpetrated against First City, and the government suggested no link during argument or cross-examination. Given the district court's instruction limiting the use of the evidence of Magnuson's prior conviction to impeachment, any marginal prejudice to Cihak from the extra details disclosed to the jury had little or no effect upon the verdict. See United States v. Gadison, 8 F.3d 186, 192 (5th Cir. 1993) (The test for harmlessness is "whether the inadmissible evidence actually contributed to the jury's verdict" and suggesting that we will "reverse a conviction only if the evidence had a substantial impact on the verdict") (internal quotation marks omitted).

D

For the first time in their reply briefs, defendants Cihak and Allen attack their convictions for misrepresentation and misapplication on the ground that the trial judge improperly removed the element of the materiality of their misstatements from the jury. Citing United States v. Gaudin, 115 S.Ct. 2310, 2322 (1995), the defendants argue that the materiality of their misstatements should have been submitted to the jury. The defendants concede that, because they did not raise this argument in the trial court, our review on this question is limited to a search for plain error. For its part, the government asks us to reach this issue in spite of the fact that the defendants did not raise it in their original briefs. Moreover, the government at

43

oral argument suggested that we assume that a <u>Gaudin</u> error had occurred at trial. We accept the invitation, assume that <u>Gaudin</u> establishes that the removal of the materiality issue from the jury constituted error,[7] and review this question for plain error only.

<u>United States v. Keys</u>, 67 F.3d 801, 811 (9th Cir. 1995), was a perjury prosecution in which the defendant had joined the prosecution in requesting an instruction that the materiality of his misstatement was not a jury question. The court, although noting that the defendant Keys had invited any <u>Gaudin</u> error, nevertheless used the plain error framework to decide the case. The court further assumed that the "plainness" of the error should be decided by reference to the status of the law at the time of direct appeal, not at trial. <u>But see</u> <u>United States v. Kramer</u>, Nos. 90-5055, 90-5360, 90-5431, 90-5751, 91-5659 and 93-4951, 1996 WL 13778 (11th Cir. Jan 16, 1996) (noting some confusion among the courts regarding at what point in a defendant's case an error must be plain). Finally, the <u>Keys</u> court assumed that because the error was arguably "structural," the defendant might not need to show that the mistake affected the result of his trial. <u>But</u> <u>see</u> <u>Kramer</u>, 1996 WL at *6, *7 (holding that a <u>Gaudin</u> error did not affect the defendant's substantial rights because no rational jury could have disputed the materiality of the misstatements at issue). Nevertheless, the court refused to exercise its discretion to

---

[7] We also accept the government's invitation to assume without deciding that materiality is an element of the crimes involved in this case. <u>But see</u> <u>Gaudin</u>, 115 S. Ct. at (Rehnquist, C.J., concurring).

44

reverse because it found the evidence of materiality overwhelming. See <u>United States v. Olano</u>, 113 S. Ct. 1770 (1993) (stating that even if the three prerequisites of plain error are met, a court of appeals has discretion to affirm or reverse). The court reasoned, "In the circumstance of an error which did not matter, and was not error when made, reversal of the conviction rather than affirmance would impair the fairness, integrity and public reputation of judicial proceedings." 67 F.3d at 811.

We follow <u>Keys</u> in this case. We assume that any error was plain because the Supreme Court handed down <u>Gaudin</u> during appellate review of this case, and we assume that the "structural" nature of the error relieves the defendant of the necessity of showing prejudice, although we believe that the <u>Kramer</u> approach has great appeal.[8] We nevertheless refuse to exercise our discretion to disturb these convictions.

The misrepresentations covered by the defendants' <u>Gaudin</u> argument span the entirety of their various schemes. In each case, the evidence of materiality was overwhelming. We find it difficult to believe, for instance, that the credit unions and pension funds would still have invested in Cihak's bogus "CDS" at Worth had they known that their funds would not be federally insured and that Cihak would use the money to pay back a prior bad debt of Cihak's business associate. Any suggestion that First City would have paid consultant fees had it known that Cihak would receive kickbacks is

---

[8] We are aware that in the Ninth Circuit, both of our assumptions are law. See <u>United States v. Gaudin</u>, 28 F.3d 943, 951-52 (9th Cir. 1994), <u>aff'd</u>, 115 S.Ct. 2310 (1995).

45

untenable, equally so that the bank would have funded loans had it known that the borrower had far less income than was represented in the loan documents or already owed previously undisclosed $1,000,000 to a wealthy Chicago family. We are not convinced that Citibank would have loaned Cihak $1,600,000 on an unsecured basis, especially had it known that Cihak would use the money to pay back the Fahy debt instead of to start a business. We find it hard to believe that First City did not consider important Allen's misrepresentations that the financial statements supporting the fraudulent loans were prepared by a CPA. In each instance, substantial testimony from various officials at Citibank, the credit unions, the pension funds, and First City established that these entities would not have engaged in the transactions underlying the indictment had they known the truth.

It was perhaps for these reasons that the defendants never mentioned materiality to the district court. Cf. United States v. Wells, 63 F.3d 745, 748 & n.3 (8th Cir. 1995) (reversing where "the materiality issue was hotly disputed"), cert. pet. filed Jan 31, 1996, No. 95-1228. Although defense counsel at oral argument stated that the defendants had argued materiality to the district court, she did not specify where, we have been unable to locate such argument in the record. The defense elicited little or no testimony to the effect that, assuming the government's theory of the case was correct, the misrepresentations had not substantially affected the actions of the fraud victims. They did not alert the trial judge during the discussion of the charge, or in their post-

46

trial memoranda, that they disputed materiality. We fail to see how reversing these convictions would serve judicial integrity, or why principles of fundamental fairness require a second chance to argue a theory so lacking support in evidence and reality that the defendants chose not to raise it below.

E

In his final attack on the district court's handling of this case, Cihak argues that the district court erred in calculating his offense level corresponding to the money laundering convictions. The Pre-Sentence Report calculated the value of the funds laundered by adding together the total value of the fraudulent loans and consulting fees. Upon Cihak's objection, the district court completed a new calculation based only upon the amount of money diverted to Cihak's benefit.[9] In this court, Cihak argues that this new calculation was also erroneous, and that the court should have excluded Lucterhand's consulting fees because they were used to repay the Lucterhand loan.[10] Cihak also contends that the district court erred in including the value of the Citibank loan because no evidence supported a conclusion that these funds were laundered.

We reject Cihak's first argument. Although he uses terms like "artificial inflation" instead of "loss," Cihak's contention is

---

[9] The government has not perfected a cross-appeal in this case.

[10] The government disputes whether Cihak raised this question below. Because we find no error in this portion of the calculation, we would also find no plain error.

that the Lucterhand consulting fees should not be included because they caused no additional loss to First City Bank.  The money laundering guideline does not depend on loss; it depends on the "value of the funds" that the defendant laundered.  U.S.S.G. § 2S1.1(b)(2); United States v. Johnson, 971 F.2d 562, 576 (10th Cir. 1992); cf. United States v. Frydenlund, 990 F.2d 822, 826 n.5 (5th Cir.) (applying U.S.S.G. § 2F1.1 to a check kiting scheme, and focusing on the amount of "loss" the scheme produced), cert. denied, 114 S.Ct. 337 (1993).  The difference in focus in section 2S1.1 from, for instance, section 2F1.1, depends on the different nature of the harms they measure.  Section 2S1.1 measures the harm to society that money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains.  Section 2F1.1 measures the harm to society and the individual suffered when an innocent person is deprived of her money.  In applying section 2S1.1, courts should follow the guideline's plain language and focus on the value of the funds laundered.

We also reject Cihak's second argument.  The evidence at trial showed that Cihak flushed the proceeds of the Citibank loan through the Worth STS trust account, used some of the money to repurchase the unmatured federal bonds that Fahy had previously converted to his own use, and returned the bonds and remaining cash to Mount Greenwood and First of Danville.  This transfer was cumbersome and unnecessary; Cihak could easily have conducted the same transactions from his own account at Citibank.  The trial court could infer that the purpose of using the Worth STS trust account

48

as a conduit for these funds was to conceal the fact that Cihak, not Fahy, was making the banks whole. The court could conclude that this concealment helped forestall what might have been uncomfortable questions from officials at Mount Greenwood and First of Danville, some of whom also had a relationship with Worth, regarding how Cihak collateralized such a large loan used entirely to pay off a previously existing bad debt. Finally, the court could conclude that large checks written to entities not associated with any automobile accounts receivable business might have prompted inquiries from Citibank. We find no error in Cihak's sentence.

V

Defendant Swift makes two additional arguments.

A

Swift argues that there was a fatal variance between allegation of a single conspiracy to defraud First City Bank found in count one and the proof at trial, which assertedly showed multiple overlapping conspiracies. We disagree.

Count one alleged a single conspiracy implemented by the kickbacks from the various consultants to Cihak and the various fraudulent loans Cihak arranged for First City Bank to fund to Allen, Swift, and Lucterhand. The evidence at trial supported the grand jury's allegations as to the implementation of the kickback and fraudulent loan schemes. The issue is whether the jury could conclude from the evidence that there was a single conspiracy.

49

In deciding whether a string of actions by various individuals is a single conspiracy or multiple conspiracies, we look to three factors: "(1) the existence of a common goal; (2) the nature of the scheme; and (3) overlapping of participants in the various dealings." United States v. DeVarona, 872 F.2d 114, 118 (5th Cir. 1989). In United States v. Richerson, 833 F.2d 1147, 1149-54 (5th Cir. 1987), several employees of an entity involved in oil drilling conspired with employees of vendors. The conspirators arranged a series of kickbacks and bribes, with the vendors recovering their costs by falsely invoicing the drilling company and with the company's conspirators approving the invoice. We held that the conspirators labored towards the common aim of enriching themselves at the expense of a single victim, the drilling company. Regarding the scheme's inherent nature, we noted that the level of each conspirator's participation depended on his position in the various businesses involved, but that each conspirator furthered the scheme, and the scheme's implementation involved the repetition of similar modus operandi. Finally, we held that the common participants factor was satisfied, reasoning that a "single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." 833 F.2d at 1154.

We find Richerson instructive. As in that case, the common goal among Cihak, Swift, Allen, and Lucterhand in this conspiracy was to defraud a single victim, First City. As in Richerson, the

50

steps taken to reach this common goal bore a marked continuity and similarity:  kickbacks from consultant fees and fraudulently obtained loans.  Cihak was the key person directing and overseeing the activities of the conspirators.  See DeVarona, 872 F.2d 119 (relying on the continuing participation of a "key figure" to hold that the evidence supported the jury's inference of a single conspiracy).  There were additional points of overlap.  At Cihak's direction, Allen helped Lucterhand prepare false documents to support Lucterhand's $1,800,000 loan.  A forged signature of an Allen & Associates' CPA appeared on the Swift loan documents; Allen had been Swift's accountant for years at the time of the loan.  The cover story for the Allen kickbacks to Cihak involved Allen purchasing certain debt that Swift owed to the Cochonours.  The Cochonours' name appears again in removal of the Swift loan from the books of First City.

Swift does not take issue with this.  Instead, he denies that he had anything to do with Cihak's fraudulent activities in Chicago regarding Fahy, the Citibank loan, and the CD scam; he urges that the government's proof of these activities at trial risked an improper rub-off of Cihak's guilt to him.  Swift has not appealed the trial court's denial of his motion to sever or argued a due process violation.  Instead, he has relied on a fatal variance theory.  No variance existed because count one of the indictment did not recite Cihak's Chicago activities as part of the manner or implementation of the conspiracy against First City.

B

Swift's second argument is that the trial court abused its discretion in allowing testimony to continue for one of the thirty-eight days of trial in his absence. Any error was harmless beyond a reasonable doubt.

After several weeks of trial, and at the end of his case, Swift took the stand. On Thursday, October 28, 1993, the government began to cross-examine Swift. At the end of the day, the court recessed for the weekend. On the following Monday morning, Swift's counsel found Swift prostrate in his bathroom. The court continued the case until Wednesday afternoon, at which time it held a hearing. At the hearing, the court heard representations from the prosecution that Swift's physicians had determined that no medical basis existed to explain his condition. The trial judge stated that an hour before he had spoken to Swift's doctor, who informed him that no medical condition explained Swift's condition and that tests had revealed the presence of unprescribed drugs or other medication in Swift's system. The trial judge then repeated his belief, expressed numerous times throughout the trial, that Swift was medicating himself with improper drugs in an effort to obtain a mistrial or a severance. The court also noted that Swift had frequently excused himself from the courtroom and stayed absent for periods of time.

The court ordered the trial to resume the following morning, and expressed a willingness to recall witnesses if necessary. At that time, the court informed the jury that Swift's absence was due

52

to an illness.  Defendant Allen called Thomas Clements and Don Cochonour.  Swift's counsel had no questions for Clements, who had no information regarding his case, but he did conduct a lengthy and extensive cross-examination of Cochonour in an attempt to show that Swift had paid back the entirety of his debts to the Cochonour family at the time he borrowed money from First City Bank.  This cross-examination exhaustively covered several years of horse-dealings and land and insurance transactions.  The next day, Swift returned to the trial without comment.

Fed. R. Crim. P. 43 provides the defendant a right to be present at trial, but we have held repeatedly that a Rule 43 violation can constitute harmless error.  United States v. Alikpo, 944 F.2d 206, 209-11 (5th Cir. 1991); United States v. Gradsky, 434 F.2d 880, 884 (5th Cir. 1970), cert. denied, 409 U.S. 894 (1972); see Fed. R. Crim. P. 52(a).  Our cases have identified at least two sources of prejudice to a defendant from the continuation of the case against her in her absence:  that the jury might draw an adverse inference from the absence, and that the defendant might have information necessary to the effective advocacy of her case.

We find no reasonable possibility that either type of prejudice existed here, and in the unlikely event that the trial court erred, we find that error harmless.  Regarding the possibility that the jury might draw an adverse inference, we note this trial consisted of dozens of witnesses and over seven weeks of testimony.  Swift repeatedly absented himself from the proceedings of his own accord.  The record reflects that defendant Cihak left

53

early one afternoon to attend his daughter's wedding. The trial court told the jury that Swift was absent because he was ill. Given these facts, it is difficult to believe that the jury, during its deliberations, even remembered that Swift had been absent for this portion of the trial, much less drew an adverse inference. We find no reasonable possibility of prejudice in the jury's deliberations. Cf. Alikpo, 944 F.2d at 209-10 (expressing concern that the jury might draw an adverse inference when the defendant "cavalierly" walked into the courtroom after missing the beginning of the trial, when the jury had no explanation of the defendant's absence).

Regarding the second possible source of error, we see no possibility that Swift could have assisted his counsel in the cross-examination of Don Cochonour so as to change the jury's verdict. Counsel's cross-examination was detailed and extensive, covering several years of horse dealings between the Cochonours and Swift. Although Cochonour may have been an important witness to Swift, we note that Swift apparently did not intend to call Cochonour during his own defense. Cochonour's basic testimony on direct and cross-examination, that Swift owed the Cochonour family over $1,000,000 at the time he borrowed money from First City, was corroborated by Swift's own grand jury testimony. At the conclusion of Cochonour's testimony, Swift's counsel made no objection to excusing the witness and did not at any later time accept the trial court's offer to recall witnesses. On appeal to this court, Swift has identified no subject area left uncovered as

54

a result of his absence, nor any question left unasked.  We realize that the government's burden to prove harmlessness in such circumstances is an "onerous one," Alikpo, 944 F.2d at 211, and we are especially wary of labeling such an error harmless when the absence at issue occurs during the trial testimony of a fact witness.  Nevertheless, our cases establish that no per se rule requires us to reverse, and our review of the record convinces us that no reasonable possibility exists that Swift's absence contributed in any way to the jury's verdict.

AFFIRMED.