**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 97-50405
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

RICARDO BRIBIESCA, MANUEL PACHECO, ALSO KNOWN AS
MANUEL OCTAVIO PACHECO ALVAREZ, FELIPE ZARAGOZA,
RMI SERVICES INTERNATIONAL,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas
(SA-95-CR-171-2)
_____

June 29, 199

Before POLITZ, HIGGINBOTHAM, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Defendants-Appellants Manuel Pacheco, Felipe Zaragoza, and Ricardo Bribiesca appeal their respective convictions and sentences for violations of the Travel Act, 18 U.S.C. § 2314, money laundering, and conspiracy. For reasons that follow, we affirm the defendants' convictions, vacate their sentences, and remand for resentencing.

I.

This case arises out of the operations of Defendant RMI

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Services International, Inc. ("RMI"), which from 1991 to 1995 carried out a scheme to defraud cash-strapped businesses in Mexico of millions of dollars. Pacheco opened RMI in April 1991 in San Antonio, Texas. Zaragoza and Bribiesca were brought in as employees of RMI, and remained so until the FBI shut the operation down in June 1995. The defendants falsely held themselves out as sophisticated middlemen in the arena of international finance. They falsely claimed to have good contacts with legitimate financial institutions and lenders worldwide from whom they could obtain loans for their customers. Under this guise, the defendants induced their victims to travel from Mexico to the United States and to pay millions of dollars' worth of fees to RMI.

Though the particulars of the scheme changed and became more sophisticated over time, RMI's activities followed a characteristic pattern.[1] Its customers came primarily from Mexico, where business financing was difficult to obtain. In nearly every instance, the customer was at a point of desperation, and was hoping to obtain multi-million dollar loans in the international lending community to consolidate his debts and to keep his business alive. Upon arriving at RMI, the customer was treated like royalty. Pacheco made a presentation on the international services he could provide, and regardless of how bleak the financial situation was, he invariably informed the customer that RMI could secure for him the

---

[1]The record below encompasses a trial transcript in excess of 10,000 pages and thousands of pages of documentary exhibits detailing the particulars of the defendants' scheme. Lacking both the inclination and the resources to recount the entire record here, we necessarily confine our description of the defendants' actions to a general summary.

loans he needed. First, however, the customer was required to pay RMI significant advance fees for a "feasibility study." These studies consisted of translating the customers' business and financial documents into English and appraising their properties. RMI misrepresented the qualifications of the people preparing the studies and overcharged for their services. The studies were then assembled into leather binders that supposedly were to be presented to financial institutions in support of the customers' loan requests. More often, however, the binders were merely kept in Zaragoza's office.

Once the preliminary work was completed, Pacheco usually informed the customer that he could expect his loan within thirty days. Contrary to this assurance, however, the customer soon met with excuses and delays. As time passed and the customer became increasingly anxious, Pacheco would propose an alternate plan for quick funding, typically a letter of credit. In order to obtain the letter of credit, the customer was required to pay additional fees based on the face value of the instrument. When the customer received the letter of credit, however, he quickly discovered that it was worthless. Moreover, the customer then found that Pacheco had disappeared and could not be contacted. It was undisputed at trial that no RMI customer ever received a loan or a valid letter of credit through the efforts of RMI.

In August 1996, a grand jury issued a 44-count superseding indictment against RMI, Pacheco, Zaragoza, and Bribiesca. Counts 1-42 alleged individual violations of 18 U.S.C. § 2314, and aiding and abetting such violations. Count 43 alleged money laundering in

3

violation of 18 U.S.C. § 1956(a)(2)(a), and aiding and abetting such money laundering. Count 44 alleged conspiracy to carry out the scheme in violation of 18 U.S.C. § 371. The government also included a demand for civil forfeiture of various properties, including real estate, motor vehicles, and bank accounts, pursuant to 18 U.S.C. §§ 1956(a)(2)(A), 2314, and 982(a)(1).

Trial commenced in October 1996, and concluded in December 1996. The jury returned 22 guilty verdicts against Pacheco--20 Travel Act counts[2] plus the money laundering and conspiracy counts. Pacheco was sentenced to concurrent terms of 60 months', 132 months', and 180 months' imprisonment on the conspiracy, Travel Act, and money laundering offenses, respectively. Additionally, he received concurrent 3-year supervised release terms, a $1,150 mandatory special assessment, and was ordered to pay $8,115,562 in restitution. The jury found Zaragoza guilty on 10 Travel Act counts plus the money laundering and conspiracy counts. He was sentenced to concurrent terms of 60 months' imprisonment on the conspiracy offense and 90 months on the Travel Act and money laundering offenses. He further received concurrent 3-year supervised release terms, a $600 mandatory special assessment, and was ordered to pay $8,115,562 in restitution. The jury found Bribiesca guilty on 9 Travel Act counts plus the money laundering and conspiracy counts.

_____

[2]Before trial, the government and the defense reached a Stipulation and Agreement whereby the government agreed to present only half of the 42 Travel Act counts to the jury and to dismiss the remaining counts prior to deliberations, and the defense agreed, inter alia, to stipulate that the clients named in the 21 dismissed counts had paid the amounts listed in the indictment and had not received any loans. During trial, the government dropped another Travel Act count and went forward only on the 20 remaining Travel Act counts plus the money laundering and conspiracy counts.

4

Bribiesca was sentenced to concurrent terms of 97 months' imprisonment on the conspiracy offense and 60 months on the Travel Act and money laundering offenses. He also received concurrent 3-year supervised release terms, a $550 mandatory special assessment, and was ordered to pay $6,600,692 in restitution. This appeal followed.

## II.

Pacheco objects to the government's pursuit of multiple civil forfeiture lawsuits in the months leading up to his criminal trial, arguing that the government's actions exhausted his resources, chilled his ability to defend himself, and violated due process and fundamental fairness. This argument is without merit. There is no constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal proceedings against the same defendant. The Supreme Court has expressly held that the government may pursue civil and criminal actions either simultaneously or successively. Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 52 (1912); United States v. Kordel, 397 U.S. 1, 11 (1970). Apart from his groundless assertion that the government's very pursuit of civil forfeiture in this case evidences bad faith, Pacheco fails to present any evidence that the government was motivated by anything other than its legitimate interest in recovering stolen property. Indeed, the government moved to stay the civil forfeiture proceedings pending the resolution of the criminal proceeding. These are hardly the actions of a body intent on using its "awesome and coercive power" to deprive a defendant of due process and fundamental fairness. We

5

conclude that no right of Pacheco's was violated, and that no prejudice resulted from the government's simultaneous pursuit of civil forfeiture and criminal prosecution.

### III.

Pacheco and Zaragoza both challenge the trial court's ruling admitting in evidence, without limitation, a threatening letter. This letter was sent by Maruicio Aguirre Orcutt, an employee of RMI, to Eugenio Albo Moreno, a former client of RMI who had attempted to expose RMI's fraudulent practices. Pacheco argues that the letter should have been excluded under Fed. R. Evid. 404(b), because it is extrinsic evidence not relevant to the issue of intent. Zaragoza and Pacheco further argue that the letter should have been excluded under Fed. R. Evid. 403, because its probative value is outweighed by the danger of unfair prejudice. We find these arguments unpersuasive.

The admissibility of evidence is a matter within the sound discretion of the trial court. United States v. Dixon, 132 F.3d 192, 196-97 (5th Cir. 1997). This court reviews the district court's evidentiary rulings for an abuse of discretion. United States v. Garcia Abrego, 141 F.3d 142, 174 (5th Cir. 1998). We find no abuse of discretion here. First, we agree with the government that Rule 404(b) is inapplicable. The evidence of the threatening letter was not extrinsic within the meaning of Rule 404(b), because it involved conduct within the conspiracy. Paragraph 8 of the superseding indictment charged that "it was a further part of the aforementioned scheme and artifice to defraud that the defendants threatened employees and victims who tried to expose said scheme."

6

In this circuit, acts committed in furtherance of a charged conspiracy are themselves part of the conspiracy. Garcia Abrego, 141 F.3d at 175. The letter from Orcutt to Moreno is evidence of an act committed in furtherance of the charged conspiracy; specifically, it is evidence of a threat designed to intimidate a victim attempting to expose the conspiracy. Such evidence constitutes intrinsic evidence, and is not subject to exclusion under Rule 404(b). See id.; United States v. Krout, 66 F.3d 1420, 1431 (5th Cir. 1995).[3]

Likewise, Rule 403 is inapposite. Most evidence presented by the government will be prejudicial to a criminal defendant. But Rule 403 "only excludes evidence that would be unfairly prejudicial to the defendant." United States v. Townsend, 31 F.3d 262, 270 (5th Cir. 1994) (emphasis added). The threatening letter was admitted as direct evidence of the existence of the conspiracy charged, a conspiracy in which both Pacheco and Zaragoza participated. Though undoubtedly prejudicial in the sense that it was indicative of the defendants' guilt, the letter was not unfairly prejudicial. As such, the district court did not abuse its discretion in admitting the letter without limitation.

IV.

Pacheco asserts that the trial court erred in denying his

_____

[3]Pacheco notes that the letter was not received by Moreno until July 10, 1995, several weeks after the life of the conspiracy alleged in the indictment. That fact does not change our analysis. This court has held that evidence of acts committed pursuant to a conspiracy remains intrinsic evidence, even though it was adduced before or after the dates alleged in the indictment, so long as it is "inextricably intertwined" with the crime charged. United States v. Clements, 73 F.3d 1330, 1337 (5th Cir. 1996); United States v. Hass, 150 F.3d 443, 449 (5th Cir. 1998).

7

motion to compel the government to elect counts on which to go to trial, or to sever the trial into separate units. He argues that joinder of all the offenses into one trial was prejudicial to him due to the volume and complexity of the documentary and testimonial evidence. Similarly, Zaragoza and Bribiesca contend that the district court erred in denying their respective motions to sever. Each argues that he was prejudiced by the spillover effect of the voluminous evidence against Pacheco and by the evidence of Pacheco's unsavory and potentially violent personal conduct. We disagree.

Denial of a motion to sever is reviewed for abuse of discretion. United States v. Bermea, 30 F.3d 1539, 1572 (5th Cir. 1994). The district court did not abuse its discretion in denying the defendants' motions. With respect to Pacheco's motion, prior to trial the government agreed to present to the jury only 21 of the 42 Travel Act counts contained in the indictment. The trial involved only three defendants and one conspiracy, and lasted only two and a half months. This court has declined to find an abuse of discretion in cases of much greater magnitude and complexity. See, e.g., United States v. Phillips, 664 F.2d 971, 1016-17 (5th Cir. 1981) (6-month trial; 36-count, 100-page indictment; 12 defendants); United States v. Martino, 648 F.2d 367, 385-86 (5th Cir. 1981) (3-month trial; 35-count indictment; 20 defendants; more than 200 witnesses). The case on which Pacheco relies, United States v. Stratton, 649 F.2d 1066 (5th Cir. 1981), is not applicable here, as the decision in that case was based on the absence of a key defendant at trial and the resulting prejudice to

8

the other co-defendants. Accordingly, the district court did not abuse its discretion in denying Pacheco's motion.

With respect to Zaragoza's and Bribiesca's motions, it is the general rule of this circuit that persons indicted together should be tried together, especially in conspiracy cases. United States v. Tencer, 107 F.3d 1120, 1132 (5th Cir. 1997). Under the abuse of discretion standard, a defendant challenging a district court's denial of severance must show that he suffered specific and compelling prejudice against which the trial court was unable to afford protection, and that this prejudice resulted in an unfair trial. United States v. Cortinas, 142 F.3d 242, 248 (5th Cir. 1998). Zaragoza and Bribiesca argue that they suffered compelling prejudice because of evidence that was offered only against Pacheco. This court has held, however, that when one conspiracy exists, severance is not required, even when the quantum and nature of the proof is different as to each defendant, so long as the trial court repeatedly gives cautionary instructions. United States v. Rocha, 916 F.2d 219, 228 (5th Cir. 1990). Here, the district court expressly instructed the jury on numerous occasions to evaluate separately the evidence against each defendant. These repeated cautionary instructions were sufficient to protect against the threat of prejudice. See Zafiro v. United States, 506 U.S. 534, 539 (1993). Consequently, the district court did not abuse its discretion in denying Zaragoza's and Bribiesca's motions.

V.

All three defendants challenge the sufficiency of the evidence as to the Travel Act counts and the conspiracy count. In reviewing

9

sufficiency of the evidence, this court must determine whether a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt. United States v. Mackay, 33 F.3d 489, 493 (5th Cir. 1994). For purposes of this determination, we view the evidence in the light most favorable to the jury verdict. Id. Following a careful review of the testimony and exhibits in the record, we are satisfied that the evidence was sufficient to sustain the defendants' convictions.

To prove a violation of 18 U.S.C. § 2314, the government must show (1) a scheme devised to defraud any person of money by false representations; (2) which causes or induces that person to travel in interstate or foreign commerce in furtherance of that scheme. United States v. Kelly, 569 F.2d 928, 933 (5th Cir. 1978). To prove aiding and abetting, the government must show that the defendant associated himself in some way with the crime and participated in it as if it were something that he wished to bring about. United States v. Parekh, 926 F.2d 402, 407 (5th Cir. 1991). To prove criminal conspiracy, the government must show: (1) an agreement between two or more persons; (2) to commit a crime against the United States; and (3) an overt act committed by one of the conspirators in furtherance of the agreement. Mackay, 33 F.3d at 493.

The evidence against Pacheco on the Travel Act and conspiracy counts was not just sufficient; it was overwhelming. The government presented a "caravan of misery" at trial--witness after witness who testified about their experiences with Pacheco and RMI, and described in detail how Pacheco had manipulated them and defrauded

10

them out of millions of dollars. The witnesses recounted one by one how Pacheco induced them to travel to the United States, won their confidence, persuaded them to pay his exorbitant fees, and then abandoned them with no loans and worthless letters of credit. The government also unveiled evidence of incriminating statements made by Pacheco, and evidence that Pacheco made threats against former employees who might have exposed his scheme. This evidence was more than sufficient for a rational trier of fact to find Pacheco guilty beyond a reasonable doubt as to each Travel Act count and the conspiracy count.

Though the evidence against Zaragoza and Bribiesca was not quite so overwhelming, it was still sufficiently damning to sustain their convictions. With regard to Zaragoza, the government presented undisputed evidence that Zaragoza was an officer of RMI and was Pacheco's right hand man. Several witnesses testified that Zaragoza threatened former employees of RMI who might "bring down" their scheme. One witness testified that he saw Zaragoza signing fraudulent letters of credit from Universal Funding and Investment ("UFI"), and the government presented evidence that Zaragoza forged a signature on a UFI letter of credit. A computer disk found in Zaragoza's office contained further samples of UFI letters of credit. Moreover, the government showed that Zaragoza was instrumental in establishing the identity of two shell corporations used by RMI to carry out the scheme. With respect to Bribiesca, the government established that Bribiesca attended and was an integral part of numerous meetings between Pacheco and his clients, that Bribiesca fraudulently misrepresented to a client that a letter of

11

credit was completed when it was not, and that Bribiesca used bugging devices to listen to and monitor RMI's clients. Several witnesses further testified as to various misrepresentations made by Bribiesca in the course of his dealings with them. Finally, blank copies of various letterheads used by RMI in furtherance of its scheme were found in Bribiesca's office. This evidence was sufficient for a rational trier of fact to find that Zaragoza and Bribiesca aided and abetted Pacheco in his scheme, and that they conspired with Pacheco to further that scheme. As such, their convictions must be affirmed.

VI.

All three defendants further challenge the sufficiency of the evidence as to the money laundering count. To prove money laundering under 18 U.S.C. § 1956(a)(2)(A), the government must demonstrate that there was a transportation or transfer or attempt to transfer monetary instruments or funds from a place outside the United States to a place inside the United States with the intent to promote the carrying on of a specified unlawful activity. United States v. $9,041,598.68, 163 F.3d 238, 254 (5th Cir. 1998). To prove aiding and abetting, the government must show that the defendant associated himself with the unlawful financial manipulations, participated in them as something he wished to bring about, and sought by his actions to make the effort succeed. United States v. Willey, 57 F.3d 1374, 1383 (5th Cir. 1995). Following a careful review of the testimony and exhibits in the record, we conclude that there was sufficient evidence for a rational trier of fact to find each defendant guilty beyond a reasonable doubt of

12

money laundering.

The record is replete with evidence supporting the money laundering convictions. Numerous financial records, including wire transfers and checks, show that approximately $4.2 million was transferred from victims' accounts in Mexico to RMI's accounts in San Antonio. The testimony of RMI's own accountant establishes that much of this money went directly into RMI's overhead. Moreover, numerous witnesses testified that they were impressed by the lavish decor and opulent furnishings of RMI, by the swank luxury cars driven by Pacheco, and by Pacheco's extravagant personal appearance. The witnesses testified that these trappings of success were part of what induced them to entrust their money to RMI. Based on this evidence, the jury was certainly entitled to infer that the money transferred from Mexico was used to promote the defendants' fraudulent scheme. This and other circuits have found such evidence sufficient to sustain a conviction for money laundering. See, e.g., United States v. Alford, 999 F.2d 818, 824 (5th Cir. 1993); United States v. Johnson, 971 F.2d 562, 565-66 (10th Cir. 1992).

Zaragoza concedes that the evidence was sufficient to convict Pacheco of money laundering, but argues that the evidence was nonetheless insufficient as to him. He contends that there was no evidence indicating that he had any control over RMI's funds or financial transactions, nor that he received anything from RMI other than regular paychecks and two loans. In the absence of any evidence showing that he was directly involved in RMI's financial dealings, Zaragoza asserts that his conviction for money laundering must be vacated. We disagree. A defendant is not shielded from

13

conviction for money laundering merely by virtue of the fact that he is not directly involved in the formal receipt and disbursement of funds. Here, the government presented substantial evidence that Zaragoza was directly and intimately involved in a fraudulent scheme to induce Mexican companies to transfer their funds to RMI's accounts in the United States. The jury could readily infer that Zaragoza was aware that these funds were being used to carry on the operation, that he wished to bring this result about, and that he directed his actions to that end. Whether Zaragoza was immediately involved in the actual financial transactions is irrelevant, so long as he associated himself with those transactions and sought to make them succeed. That being the case, we affirm his conviction.

VII.

All three defendants argue that the district court applied the Sentencing Guidelines incorrectly in determining their sentences. This court reviews the district court's interpretation of the guidelines de novo, and its application of the guidelines to the facts for clear error. United States v. Cho, 136 F.3d 982, 983 (5th Cir. 1998). A sentence imposed under the guidelines will be upheld on appeal unless the defendant demonstrates that the sentence was imposed in violation of the law, was imposed because of an incorrect application of the guidelines, or was outside the range of applicable guidelines and was unreasonable. United States v. Leahy, 82 F.3d 624, 637 (5th Cir. 1996).

The relevant guideline provision for a money laundering offense is U.S.S.G. § 2S1.1. The relevant fraud provision is U.S.S.G. § 2F1.1. Pursuant to U.S.S.G. § 3D1.2(d), offenses covered

14

by these provisions are grouped together for sentencing. Because the counts involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level will be applied. U.S.S.G. § 3D1.3(b). In this case, for each defendant the guideline producing the highest offense level was Section 2S1.1, the money laundering provision. Each defendant argues that the district court miscalculated the "value of the funds" in determining the appropriate offense level under Section 2S1.1. We agree.

Unlike the fraud guideline (Section 2F1.1), the money laundering guideline is not premised upon the amount of "loss" a scheme produced, but rather on the "value of the funds" that were laundered. United States v. Allen, 76 F.3d 1348, 1369 (5th Cir. 1996). This court has explained that these are distinct standards of measurement:

> Section 2S1.1 measures the harm to society that money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains. Section 2F1.1 measures the harm to society and the individual suffered when an innocent person is deprived of her money. In applying Section 2S1.1, courts should follow the guideline's plain language and focus on the value of the funds laundered.

Id. at 1369.

Here, both the probation officer and the district court applied the wrong standard of measurement; they applied the loss standard to the money laundering guideline. In the original presentencing report ("PSR") for each defendant, the probation officer identified the value of the funds transferred as $8,115,562. The government objected, arguing that the total should be $4,200,000, as that figure reflects the value of the funds

15

actually transported from Mexico and the Dominican Republic to the United States. The probation officer subsequently revised each defendant's PSR. In the revised PSR for each defendant, the probation officer identified the "value of the funds" as $6,993,275. Commenting on this revision, the probation officer stated:

> According to our calculations based on information provided by the FBI, the total amount transported is $6,993,275.00. This amount is based on all, or part of, the amounts specified for victims named in the indictment and 4 additional victims unnamed in the indictment. The total includes $2,280,000.00 involved in the Enrique Posadas transaction.

Based on this revision, the probation officer used the figure of $6,993,275 to determine the appropriate offense level under Section 2S1.1, rather than the government's figure of $4,200,000. In short, the probation officer used the aggregate of the fraud loss rather than the value of the funds actually transferred in determining the offense level under the money laundering guideline. The district court adopted the probation officer's calculations. The result was an incorrect application of the guidelines in calculating the defendants' sentences.

The government contends that the phrase "value of the funds" as used in Section 2S1.1 should be broadly interpreted. The additional $2.7 million, argues the government, could properly be considered for sentencing purposes as relevant conduct under U.S.S.G. § 1B1.3. We disagree. Though the relevant conduct guideline is broad, it cannot erase the distinction, recognized by this court in <u>Allen</u>, between losses suffered and the value of funds transferred. We therefore vacate the defendants' sentences and remand for resentencing on the money laundering counts. In

16

calculating the value of the funds under Section 2S1.1(b)(2) on remand, the district court is instructed to consider only those funds shown to be transported into the United States with the intent to carry on an unlawful activity. The district court may consider relevant conduct not charged in the indictment in making this determination, but is limited to relevant money laundering conduct. That is, the district court may consider relevant conduct that involves the actual transportation of funds into the United States with the intent to carry on an unlawful activity, but it may not consider total losses produced by the underlying fraudulent scheme.[4]

The defendants' remaining sentencing challenges are without merit. Pacheco argues that the probation officer incorrectly determined the total "value of the funds" under Section 2S1.1 by including travel expenses and interest paid on the money borrowed. He is mistaken. Although the computation contained in the original PSR included travel expenses and interest, the PSR was subsequently revised. The revised PSR eliminated travel expenses and interest from its calculations, and reduced the total from $8,940,029 to $6,993,275. Though that figure was incorrect for the reasons given above, it did not include travel expenses and interest.

Bribiesca contends that he was improperly held accountable for

---

[4]This instruction also relates to Pacheco's argument that the probation officer incorrectly added to the loss calculation losses from nine individuals who were never mentioned in the indictment. The district court is not prohibited from considering those losses just because the nine victims were never mentioned in the indictment. It must, however, confine its consideration to those funds transported to the United States with the intent to carry on an unlawful activity. Proof of loss, standing alone, may not be used to calculate the value of the funds under Section 2S1.1.

17

acts of the other defendants that occurred prior to November 1993, when he joined RMI. He too is mistaken. Although the original PSR held Bribiesca accountable for the total value of the funds fraudulently obtained, the PSR was revised to reflect Bribiesca's more limited participation in the conspiracy. The parole officer reduced Bribiesca's total accountability from $8,940,029 to $5,834,000. His total restitution was similarly decreased to $6,600,692. These reduced figures reflect Bribiesca's shared responsibility following his entry into the conspiracy; they do not hold him accountable for conduct that occurred before he joined the conspiracy.

## VIII.

For the foregoing reasons, the defendants' convictions are AFFIRMED, their sentences are VACATED, and this case is REMANDED to the district court for resentencing.[5]

---

[5]In his reply brief, Zaragoza requests permission to reurge his request for a downward departure on resentencing in light of this court's decision in United States v. Hemmingson, 157 F.3d 347 (5th Cir. 1998). That issue is not properly before this court, and therefore we do not decide it. Nothing in this decision, however, should be read to prohibit the district court from considering such a request.